# ATTORNEY GRIEVANCE COMMISSION OF MARYLAND *v.* JOHN SELLERS COLLINS

[Misc. (BV) No. 11, September Term, 1982.]

*Decided March 24, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Edwin A. Lechowicz* for respondent.

*Glenn M. Grossman,* Assistant Bar Counsel, with whom was *Melvin Hirshman,* Bar Counsel, on the petition, for petitioner.

COUCH, J., delivered the opinion of the Court.

Acting through Bar Counsel, the Attorney Grievance Commission filed a Petition for Disciplinary Action against John Sellers Collins alleging violations of certain provisions of the Disciplinary Rules of the Code of Professional Responsibility. Preliminarily, we believe it necessary to an understanding of this complex matter to set forth a rather lengthy summary of the facts and circumstances preceding the filing of the petition.

Antonio Pinero was born in Cuba and migrated to the United States in 1957. He worked as a cook and dishwasher in a restaurant in Wilmington, Delaware. In 1961, he opened and operated a small restaurant in Pennsylvania and had two small diners in Delaware. In 1967, he leased a cafeteria in Washington, D.C., which he operated until 1973 or 1974. He had a beer license, which he obtained himself, for a couple of years in connection with the cafeteria.

In 1974, Pinero saw a newspaper advertisement for the sale or lease of a restaurant located at 1634 Annapolis Road, Odenton, Maryland, and owned by the English Company (hereafter English). At that time, the restaurant was closed and boarded up. Pinero met with a representative of English and was told the man who owned the adjacent motel

had a liquor license for sale. This turned out to be Collins, who was managing partner of Fort George Associates (hereafter Fort George), the motel owner. The other partners were Arthur W. Meleski, Elizabeth J. Meleski, and Charles H. Steffey, Inc. Pinero contacted Collins and was told that he (Collins) had a Class B liquor license for sale for $15,000. When Pinero asked why he could not apply for a new license as he had done in D.C., he was told by Collins that there was a "moratorium" on the issuance of new licenses. They negotiated the contract price to $12,500.

At some point, Pinero learned that Collins was an attorney and asked his advice regarding the lease with English. Collins also told Pinero that in order to obtain the liquor license, it would be necessary for him to incorporate since he was not a resident of Anne Arundel County. Collins agreed to prepare the corporate documents and billed Pinero for these services.

Collins also prepared the contract for the sale of the liquor license from Fort George to Pinero. Pinero requested a non-competition clause in the contract because of the motel. Collins told him that such a clause was not necessary because they were not going to have a restaurant in the motel. In fact, there came a time when the motel added a restaurant and went into competition with Pinero. The contract for the sale of the liquor license was executed June 21, 1974. Collins signed on behalf of Fort George as managing partner. No payment was due at that time. The contract provided as follows:

> Whereas the Vendors are the owners and possessors of a certain Class B liquor License issued by the Board of License Commission of Anne Arundel County for the premises known as 1630-32 Annapolis Road, unto Elizabeth J. Meleski trading as Butch's Beef and Beer, and
>
> Whereas, the Vendee is the tenant of the adjacent property known as 1634 Annapolis Road, Odenton, Maryland and does intend to re-open the restaurant and tavern business on the said premises and

Whereas, the Vendees [sic] do desire to transfer their interest in the said Class B Liquor License and the said Vendees do desire to acquire and purchase the Vendors said interest, these premises are made.

Now, therefore, that in and for the consideration of the sum of One Dollar ($1.00) and other good and valuable consideration the receipt whereof is hereby acknowledged, the said Vendors do hereby bargain and sell and transfer and assign all their right, title and interest in and to the Class B Seven Day Liquor License owned by them unto the said Vendee at and for the purchase price of Twelve Thousand Five Hundred Dollars ($12,500) which said sum the Vendees have agreed to pay in monthly installments equal to six Percent (6%) of the gross sales of all revenues from alcoholic beverages sold on the said premises known as 1634 Annapolis Road, Odenton, Maryland, said monthly installments shall continue to be paid by the Vendee until the full and just sum of Twelve Thousand Five Hundred Dollars ($12,500) shall have been paid. Provided, further, that in the event that the full sum has not been paid within thirty-six (36) months from the date hereof, then in that event any remaining balance shall become due and payable on the first day of the thirty-six month (36) from the date of the signing of this Agreement.

The Vendors do agree to assist in any and whatever the Vendees in the matter of the transfer of the said License to them including whatever assistance it may render at the hearing before the Zoning Hearing Officer for Special Exception and before the Board of License Commissioners for the transfer of the said License.

The Vendee agrees that it shall not transfer or otherwise dispose of the said Liquor License without the written permission of the Vendor for as long as there is any unpaid balance on the con-

sideration as stated herein above. Should any of the monthly installments not be paid when due for a period of ten (10) days after it shall become due, the whole balance shall then become due and collectable at once.

Some time in the summer of 1974, Collins learned that Fort George had no license to sell as Mr. Meleski had allowed the license to expire as of April 30, 1974.

On August 26, 1974, Collins appeared with Pinero at a hearing before the Zoning Hearing Officer in order to get a special exception for the liquor license. Collins represented that they were seeking a transfer of an existing license. According to Collins's testimony, he was unaware at that time that the license had expired and he did not learn of this fact until he called George M. King, at the Board of License Commissioners, to check on the status of the application for transfer. King suggested that they apply for a Special Hotel Motel liquor license and Collins asked him to fill in the necessary information and mail him the application. Collins never notified the Zoning Hearing Officer that there was no license to transfer because it did not occur to him that it was necessary.

There is a dispute over whether Collins informed Pinero that the Class B license had expired and that Pinero was applying for a Special Hotel Motel license. According to Collins, he informed Pinero of this fact when he got him to sign the application for the liquor license. Collins testified that he explained to Pinero the difference between the two licenses and Pinero agreed to proceed because he was anxious to get a liquor license. On the other hand, Pinero's testimony was that he did not learn he had a Special Hotel Motel license until 1977 when he went to see King and was told a license had never been transferred.

It is undisputed that in October of 1974 Pinero would have been unable to get a Class B license on his own. Although there was never actually a "moratorium" on the issuance of licenses, there were numerous licenses already in existence in that area and a new one would not have been issued.

Furthermore, it is uncontradicted that Pinero could not have obtained a Special Hotel Motel license without being sponsored by Fort George since he did not have a hotel or motel.

On October 8, 1974, Collins appeared with and on behalf of Pinero at a hearing before the Board of License Commissioners regarding Pinero's application for a Special Hotel Motel license. This license was subsequently granted and Pinero was notified of this approval by a letter dated October 9, 1974.

In March of 1975, when Pinero applied for renewal of his liquor license, he requested that the Special Hotel Motel license be replaced by a Class B restaurant license. The reason for the change was that "the business generated directly from the Motel ha[d] not materialized." [1] Collins, as general manager of General's Red Carpet Inn, also wrote a letter to the Board of License Commissioners requesting compliance with Pinero's request. The letter stated that "Fort George Associates, trading as the General's Red Carpet Inn ha[d] no objection to the said exchange. . . ." Pinero's request for a change in license was granted and he received a Class B license in 1975. King's testimony was that the Special Hotel Motel license was granted on the basis that "the land was all supposed to be leased in all one complex . . .", including a right-of-way owned by Baltimore Gas and Electric between the motel and the restaurant. In 1975, King was told that the property was not contiguous. He was then "caught between a rock and a hard place, so he had to downgrade the license."

In September of 1977, Pinero defaulted in payment on the contract and received a letter from Fort George demanding the entire balance owed or threatening suit. Pinero went to Collins, who was no longer a partner, and sought his advice. Collins advised him to tender a payment and hopefully this would hold off a suit for the balance. In fact, Fort George

---

1. Quoting from an undated letter from Pinero to the Board of License Commissioners.

filed suit against the corporate restaurant, International Restaurant Corporation (hereafter International), September 7, 1977, alleging breach of a written agreement of sale by failure to pay. International's defense was that the Class B license was not in existence on June 21, 1974. At a pretrial hearing, based on these facts, International's motion for summary judgment was granted as to Fort George's claim for payment.

Pinero had also filed a counterclaim against the partnership alleging fraud and deceit and a "Third Party Claim" against Collins on the same basis, as well as a count seeking damages for breach of duty owed to International as its attorney. These matters proceeded to trial by jury and the following judgments were entered in favor of International:

> "Judgment Absolute extended for the Counter-Plaintiff, Pinero International Restaurant, Inc., against the Counter-Defendant, Arthur W. Meleski, in the amount of $4,068.00 compensatory damages and $11,250.00 punitive damages ($15,318.00); for the Counter-Plaintiff, Pinero International Restaurant, Inc., against the Counter-Defendant, Elizabeth J. Meleski in the amount of $4,068.00 compensatory damages and $11,250.00 punitive damages; in favor of Counter-Plaintiff, Pinero International Restaurant, Inc., against the Counter-Defendant, Charles H. Steffey, Inc., in the amount of $4,068.00 compensatory damages and $22,500.00 punitive damages, and in favor of the Third-Party Plaintiff, Pinero International Restaurant, Inc., against the Third-Party Defendant, John S. Collins, in the amount of $4,068.00 compensatory damages and $22,500.00 punitive damages, jointly and severally and as partners in Fort George Associates, Inc." *Meleski v. Pinero Int'l Restaurant,* 47 Md. App. 526, 532, 424 A.2d 784, 788 (1981).

On appeal, the Court of Special Appeals found that there should have been one judgment for compensatory damages for $4,068.00 against all partners. In addition, the Court of Special Appeals held that the uncertainty as to the jury's intention regarding punitive damages necessitated a new trial on that issue. Accordingly, the judgments were vacated and the case was remanded for entry of one judgment for $4,068.00 in compensatory damages against all appellants. A new trial was awarded on the issue of punitive damages. *Id.* at 551, 424 A.2d at 797.

The Petition for Disciplinary Action alleged violations of the following Disciplinary Rules:

Disciplinary Rule 1-102

"Misconduct

 (A) A lawyer shall not:

  (1) Violate a Disciplinary Rule.

* * *

  (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
  (5) Engage in conduct that is prejudicial to the administration of justice.
  (6) Engage in any other conduct that adversely reflects on his fitness to practice law."

Disciplinary Rule 5-101

"Refusing Employment When the Interests of the Lawyer May Impair His Independent Professional Judgment.

 (A) Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests."

Disciplinary Rule 5-104

"Limiting Business Relations with a Client.

   (A) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

Disciplinary Rule 5-105

"Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.

   (A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105 (C).

   (B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105 (C)."

Disciplinary Rule 6-101

"Failing to Act Competently.

   (A) A lawyer shall not:

* * *

   (3) Neglect a legal matter entrusted to him."

Disciplinary Rule 7-101
"Representing a Client Zealously.

(A) A lawyer shall not intentionally:

(1) Fail to seek the lawful objectives of his client through reasonable available means permitted by law and the Disciplinary Rules, except as provided by DR 7-101 (B). A lawyer does not violate this Disciplinary Rule, however, by acceding to reasonable requests of opposing counsel which do not prejudice the rights of his client, by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process.

\* \* \*

(3) Prejudice or damage his client during the course of the professional relationship, except as required under DR 7-102 (B)."

Disciplinary Rule 7-102
"Representing a Client Within the Bounds of the Law.

(A) In his representation of a client, a lawyer shall not:

\* \* \*

(5) Knowingly make a false statement of law or fact.

(6) Participate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false.

* * *

(8) Knowingly engage in other illegal con-
duct or conduct contrary to a Disciplin-
ary Rule."

A.

Pursuant to Maryland Rule BV9 b, we referred the charges to James C. Cawood, Jr., Associate Judge of the Fifth Judicial Circuit of Maryland, to make Findings of Fact and Conclusions of Law. Following an evidentiary hearing, Judge Cawood filed "Findings of Fact" and "Conclusions of Law" as set forth below:

"1. The Respondent, John Sellers Collins, was admitted to practice as a member of the Bar of the State of Maryland on October 15, 1953, and main- tains an office for the practice of law at 428 Crain Highway, N.W., Glen Burnie, Maryland 21061.

2. In 1974, Antonio Pinero sought to open a res- taurant in Odenton, Maryland, where he could sell liquor.

3. That in March or April, 1974, Mr. Pinero was offered a liquor license by the Respondent on behalf of himself and his partners who were known as Fort George Associates.

4. That Respondent was at that time the managing partner and counsel for Fort George Associates, and said partnership owned a motel on land adjacent to the restaurant operated by Mr. Pinero.

5. That Mr. Pinero asked Respondent if he, Pinero, could obtain a new license rather than pur- chase the license owned by Fort George Associates as Respondent's asking price was, in Mr. Pinero's opinion, somewhat high.

6. That Respondent represented to Pinero that it would be difficult to obtain a new license, which in

fact is true, although no moratorium existed on licenses.

7. That Mr. Pinero sought Respondent's advice concerning the lease for his restaurant, and Respondent advised him concerning said lease.

8. That Respondent prepared the incorporation of Mr. Pinero's restaurant, International Restaurant, Inc.

9. That on June 21, 1974, Respondent, on behalf of Fort George Associates, executed a contract for the sale of a liquor license to Mr. Pinero's company, International Restaurant, Inc., for the price of $12,500.00.

10. That at the time of the execution of the contract, the Respondent represented International Restaurant, Inc. as its attorney and also represented Fort George Associates as its attorney and as managing partner.

11. That Mr. Pinero, who was Respondent's client, requested that a non-competition clause be included in the agreement for the sale of the liquor license to prevent Fort George Associates from operating a restaurant on their adjacent property.

12. That said non-competition clause was omitted from the contract of sale.

13. That Respondent advised Pinero that a non-competition license was unnecessary.

14. That prior to the execution of the contract for the sale of the liquor license, the license owned by Fort George Associates had expired and no transfer of said license to Mr. Pinero was ever effected.

15. That subsequent to the execution of said contract, Respondent represented International Restaurant, Inc. and/or Antonio Pinero before a hearing of the Anne Arundel Office of Zoning Hearings.

16. That the Respondent, at said hearing, represented that a transfer of a liquor license was sought, rather than a new license.

17. That Respondent did not know in June 1974 that the license had expired, but was advised of the same shortly after the hearing before the Zoning Hearing Examiner.

18. That despite actual knowledge that the transfer was not effected, the Respondent never attempted to correct the record of the zoning hearing. However, such was not a material factor in the granting of the decision.

19. That the Respondent appeared on behalf of International Restaurant, Inc. and/or Antonio Pinero before the Anne Arundel County Liquor Board for the purpose of securing a new liquor license.

20. That a new liquor license was obtained by International Restaurant, Inc. and payments thereon were made, but the Respondent allowed and encouraged Mr. Pinero to continue to pay Fort George Associates for the non-existent liquor license pursuant to the contract of June 21, 1974, despite Respondent's actual knowledge that the liquor license did not exist.

21. That Respondent never advised Pinero that a new license had to be and was being obtained.

22. That there was no novation in the case, whereby Pinero agreed to pay $12,500.00 to Fort George Associates for their assistance in obtaining a new liquor license.

23. That Fort George Associates secured a liquor license for a restaurant opened on their property adjacent to that of Mr. Pinero.

24. That Respondent's failure to include the non-competition clause in the contract for sale of the liquor license despite Mr. Pinero's request for

same, prejudiced Mr. Pinero in that he became subject to a competing business.

25. That when Mr. Pinero sought Respondent's advice concerning the opening of a restaurant and the securing of a liquor license by Fort George Associates, Respondent advised Mr. Pinero to tender an additional payment to Fort George Associates pursuant to the June 21, 1974 contract despite Respondent's knowledge that the liquor license for which payment was being made did not exist.

## CONCLUSIONS OF LAW

Respondent violated the following sections of the Disciplinary Rules:

1-102 (A) (4) 'A lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation,' in that he did not advise Pinero upon Respondents learning that there was no Class B license to be transferred to Pinero, and in fact encouraged Pinero to continue to pay for the non-existent license. Pinero throughout was Respondent's client.

5-105 (A) & (B) 'A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105 (C),' and 'A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105 (C),' in that he represented both sides in the preparation of a contract for the sale of a liquor license, realizing that the client, Pinero, expected him to exercise his professional judgment for the protection of Pinero,

and that he should have realized, both before entering into employment and thereafter, that his professional judgment would be affected.

All are more fully set forth in the Opinion attached hereto.

We find that the following sections:

1-102 (A) (1)
1-102 (A) (5)
1-102 (A) (6)
5-101 (A)
5-104 (A)
6-101 (A) (3)
7-101 (A) (1) and (A) (3)
7-102 (A) (5), (6) and (8)

were not violated, or the violations were merged with the ones above."

Both Bar Counsel and the Respondent have filed exceptions to certain of Judge Cawood's findings.

Bar Counsel excepted to the finding that certain Disciplinary Rules "were not violated, or the violations were merged. . . ."

The Respondent excepted to the following findings made by Judge Cawood:

"1. The Court erred in its findings of fact and conclusion that Respondent was counsel for Fort George Associates. The evidence is clear that Respondent was at all relevant times the managing partner of Fort George Associates. He was never specifically retained as the partnership's counsel although he did from time to time apply his legal training, education and experience in the performance of his duties as managing partner.

2. The Court erred in its findings of fact and conclusion that Respondent represented International Restaurant, Inc. as its attorney and at the same time represented Fort George Associates as its

attorney, insofar as the contract of June 21, 1974, and its subject matter is concerned. The evidence clearly shows that, while Respondent represented International Restaurant, Inc., with reference to certain collateral matters, he did not represent it or Antonio Pinero in connection with said contract and its subject matter.

3. The Court erred in its findings of fact and conclusion that Respondent advised Mr. Pinero that a non-competition (clause) was unnecessary. The evidence is clear that the Respondent explained to Mr. Pinero that Fort George Associates did not agree to the incorporation of such a clause and that Mr. Pinero knowingly accepted the contract notwithstanding such omission.

4. The Court erred in its findings of fact and conclusion that Respondent never advised Mr. Pinero that a new license had to be and was obtained. While Mr. Pinero denied that he knew that it was necessary for a new license to be obtained, the evidence was clear that he must in fact have known and did indeed know the true facts.

5. The Court erred in its findings of fact and conclusion that there was no novation in the case. The evidence is clear that all parties agreed to the substitution of the new license for that which had expired and that it was due to the involvement, cooperation and assistance of Fort George Associates that the obtaining of a new license was possible.

6. The Court erred in its findings of fact and conclusion that Respondent's failure to include the non-competition clause in the contract prejudiced Mr. Pinero in that, as set forth hereinabove, Mr. Pinero knowingly made the decision to accept the contract without such clause.

7. The Court erred in its Conclusions of Law that Respondent violated Disciplinary Rule 1-102 (A) (4)

and 5-105 (A) and (B) and that other, undesignated, violations merged with the aforegoing violations. The facts do not support such Conclusions of Law, as is apparent from the record."

We shall consider Respondent's exceptions first.

### B.

We begin our analysis by recalling certain fundamental principles that guide our determination of disciplinary proceedings instituted against an attorney. First, as we stated in *Attorney Griev. Comm'n v. Stewart,* 285 Md. 251, 258, 401 A.2d 1026, 1029 (1979), *cert. denied,* 444 U.S. 845, 100 S.Ct. 89, 62 L.Ed.2d 58 (1979), *reh'g denied,* 444 U.S. 975, 100 S.Ct. 472, 62 L.Ed.2d 391 (1979):

> "Disciplinary proceedings for professional misconduct are not criminal proceedings. Their purpose is to protect the public by determining a lawyer's fitness to practice law."

Secondly, the findings of fact made by the hearing judge must be based on clear and convincing evidence. Maryland Rule BV10 d. Finally, as we said in *Attorney Griev. Comm'n v. Kahn,* 290 Md. 654, 678, 431 A.2d 1336, 1349 (1981):

> "Of course, the factual findings of the hearing judge in an attorney disciplinary proceeding are prima facie correct and will not be disturbed on review unless clearly erroneous." (Citations omitted).

### (1)

Collins's first two exceptions go to the finding by the hearing judge that he represented both Pinero, International Restaurant, Inc., and Fort George Associates, particularly with respect to the June 21, 1974, contract for the purchase of the latter's liquor license. We believe the record clearly supports the finding of Judge Cawood. During

cross-examination of Respondent, it was brought out that during Collins's testimony in a prior civil case concerning the same contract for the sale of the liquor license, he had represented International Restaurant, Inc., the partnership known as Fort George Associates as the managing partner, and the partnership as its attorney. Further support for this finding was also revealed in another excerpt of the testimony of Collins in the prior trial, a transcription of which was admitted into evidence before Judge Cawood. In this excerpt, which concerned the failure of the contract of sale to have included a non-competition clause, Collins was asked:

"The question is, it would have been important for your client to have that provision in the agreement, isn't that correct?"

To which he responded:

"Well, it would have been important for that client, it may not have been so important for the other clients."

The hearing judge found Collins's testimony to be full of inconsistencies and unworthy of belief. We believe the judge's finding to be supported by the record and thus find no merit to these exceptions.

(2)

Respondent's third exception concerns the finding by Judge Cawood that he had advised Pinero that the requested non-competition clause was unnecessary. It is argued that the evidence was clear that Collins told Pinero that Fort George would not agree to such incorporation in the contract and that Pinero accepted the contract notwithstanding the omission. The hearing judge stated in his written opinion:

"Respondent's testimony with regard to the non-competitive clause would be as acceptable as Pinero's, except that Respondent makes several

contradictory statements. At trial he tells us that he represented only Pinero in the signing of the agreement, and that he wouldn't give a non-competitive agreement because there was no way the pertnership could bind Pinero to serve the corporation. In another part he tells us that he agreed with Pinero that the partnership wouldn't compete. Previously he testified in the civil case that he represented both parties and forgot about the non-competitive clause. The inconsistencies make his testimony unworthy of belief.

It was obvious to anyone, including Pinero, that Collins was the managing partner in Fort George. Pinero and Respondent both recognized the potential conflict of interest. However, the statement that a non-competition clause was unnecessary, was both untrue and unethical. We have to conclude that Respondent did represent both parties to the agreement and placed his own interest over that of Pinero." (Footnote omitted).

We cannot say the judge's finding was clearly erroneous; he was free to believe or disbelieve the witness. Obviously, if he disbelieved Collins's testimony and believed that of Pinero, his ultimate finding was supported by clear and convincing evidence. Accordingly, we find no merit to this exception.

(3)

The Respondent next excepts to the finding by Judge Cawood that Respondent never advised Pinero that a new license had to be and was obtained. His argument here is based on the fact that Pinero executed an application for a new license, which application clearly showed that it was for a different license. Pinero testified, however, that the description of the type of license was not on the application when he signed it. There also was admitted into evidence letters from the Board of License Commissioners to Pinero with reference to the hearing on the license and the result

of that hearing which clearly spelled out the class of license (Special Hotel Motel Restaurant) being sought. Finally, at the hearing itself, when the matter was called, specific reference to the class of license was made. All of the above occurred in 1974. In addition, there was admitted into evidence a letter from Pinero to the Board of License Commissioners requesting a down grade of the Special Hotel Motel license to a Class B license. Although this letter is undated, Pinero testified that in March of 1975, an inspector from the Liquor Board told him he could get a license for $1,000 instead of $2,500. Pinero further testified that when he sought Collins's advice regarding this matter, Collins told him if he changed the license, he could not sell liquor at the motel. Also admitted into evidence was a letter dated March 31, 1975, from the General's Red Carpet Inn to the Board of License Commissioners concurring in Pinero's request for a Class B license in exchange for the Special Hotel Motel License. Thus, Pinero's testimony that he was not told and did not know of the new license until 1977 is inconsistent and is not supported by the record. Accordingly, we conclude that Judge Cawood's finding in this regard was clearly erroneous and that Respondent's exception is well taken.

(4)

The finding by Judge Cawood that there was no novation forms the basis for Respondent's next exception. Simply stated, the claimed novation is argued to be based on the fact that when it became apparent that the bargained for Class B license had expired, Pinero agreed to accept the Special Hotel-Motel Restaurant license instead. Judge Cawood, in his written opinion, stated:

"Also, the allegation of a novation whereby Pinero agreed to pay $12,500.00 for services rendered by Fort George and by Respondent is belied by Fort George's suit on the original contract, by the anomaly that would result if Fort George was paid for Collins' legal work, by Collins' telling Pinero to

pay the monies in 1977 without any mention of a
novation, and by the total lack of any paper work."

From our review of the record, we find there is insufficient
evidence that the parties had *agreed* to a new contract. As
Judge Cawood pointed out, Fort George sued Pinero, and
lost, on the *original* contract without asserting there had
been a novation. In addition, as we discussed above, Fort
George, acting through the General's Red Carpet Inn, acqui-
esced to the downgrading of the license in March of 1975.
There was never a modification of consideration, nor any
additional paperwork to indicate an intent to substitute a
new agreement for the June 21, 1974, contract.

### (5)

Respondent also excepts to Judge Cawood's finding that
his failure to include a non-competition clause in the
contract prejudiced Mr. Pinero in that Mr. Pinero knowingly
made the decision to accept the contract without such clause.
We see no merit to this exception. The record shows that
Judge Cawood simply did not believe Respondent in this
regard. Furthermore, the finding of prejudice was amply
supported in that the partnership indeed obtained its own
liquor license and is now in competition with Pinero.

### (6)

Finally, Respondent excepts to Judge Cawood's overall
conclusions of law that he violated Disciplinary Rules 1-102
(A) (4), 5-105 (A) and (B), and that other, undesignated,
violations merged with the aforegoing violations. In our
view, the record supports Judge Cawood's conclusions of law,
although not necessarily for the reasons he assigned.

With regard to Disciplinary Rule 1-102 (A) (4), Judge
Cawood, in finding a violation, did so on the basis that
Respondent "did not advise Pinero upon Respondent[']s
learning that there was no Class B license to be transferred
to Pinero, and in fact encouraged Pinero to continue to pay

for the non-existent license." As heretofore discussed, we do not believe the record was clear and convincing that Pinero was unaware of the need for a new license. Nevertheless, the record is clear that, with respect to the non-competition clause matter, Pinero was misled by Respondent's assurance that such a clause was not necessary because Fort George would not compete, a statement subsequently proven to be false as Fort George did exactly that. This amounts to at least misrepresentation, if not fraud or deceit, although we note that Judge Cawood did not make a specific finding of fraud. In fact, he found "[t]he evidence [was] not clear and convincing that [Collins] knew before June 7, 1974, that the license allegedly transferred had lapsed." Moreover, Judge Cawood declined to apply collateral estoppel to the jury's finding of fraud and deceit against Collins in *Meleski v. Pinero Int'l Restaurant, supra.*[2] Based upon our independent review of the record, we cannot say this finding was clearly erroneous. Collins's testimony, as well as that of Robert Scott, who was Collins's general manager at the time in question, was that Collins did not learn that the Class B license had expired until some time subsequent to the hearing before the Zoning Hearing Officer on August 26, 1974.

With regard to Judge Cawood's conclusion of law that DR 5-105 (A) and (B) were violated, we believe the record amply supports his conclusion. This Disciplinary Rule, in essence, provides that a lawyer (A) should decline employment if his independent professional judgment in behalf of his client is likely to be adversely affected, or (B) should not continue multiple employment if that same judgment is likely to be adversely affected, both except to the provisions of (C) of the Rule. Section (C) provides that in situations covered in (A) and (B) above, a lawyer may represent multiple clients if it is obvious that he can adequately represent the interests of each and if each consents after full disclosure

---

2. Bar Counsel did not take exception to Judge Cawood's ruling in this regard and, therefore, this issue is not before us.

of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

Inasmuch as the record supports Judge Cawood's conclusion that Respondent represented both Pinero and the partnership Fort George, we have no difficulty agreeing with his further conclusion that this Disciplinary Rule was violated. Of significance is the fact that being a partner of Fort George, obviously Respondent would have a personal "stake" in the sale of the license. Regardless of when Respondent became aware of the expiration of the Class B license and the fact that he was instrumental in obtaining a different class license (for a higher price), it is clear that he allowed Pinero to continue performing the contract rather than advising him of his options. This, coupled with the non-competition clause matter, supplies clear and convincing evidence that his independent professional judgment was affected.

## C.

The final matter for our resolution is that of sanction, taking into account "the severity of the conduct and the particular facts and circumstances surrounding it." *Maryland St. Bar Ass'n v. Phoebus,* 276 Md. 353, 362, 347 A.2d 556, 561 (1975). As noted above, the fundamental purpose of disciplinary proceedings is not to punish an attorney but for the protection of the public. *See Attorney Griev. Comm'n v. Stewart, supra.* In *Attorney Griev. Comm'n v. Lockhart,* 285 Md. 586, 596-97, 403 A.2d 1241, 1247 (1979), Judge Smith stated:

> "Many times in recent years this Court has quoted from *Ex Parte Brounsall,* 2 Cowp. 829 (1778), what has come to be known as 'the Lord Mansfield rule.' It is to the effect that in disciplinary proceedings the inquiry is to whether after the conduct of such individual it is proper that he should continue to be a member of a profession which should stand free from all suspicion, such proceedings not being by

way of punishment, but the court in such cases exercises its discretion whether a man whom they have formerly admitted to practice is a proper person to be continued on the roll or not. By the same token, suspension is for the protection of the public, not by way of punishment of the individual lawyer. It is protection for the public because it demonstrates to members of the legal profession the type of conduct which a court will not tolerate without sanction."

Bar Counsel has asked for disbarment in this matter, while Respondent has asked for dismissal of the Petition for Disciplinary Action. We believe a suspension of one year is the appropriate sanction in this case. As discussed above, we believe that the record clearly and convincingly supports Judge Cawood's findings that Respondent violated Disciplinary Rules 1-102 (A) (4) and 5-105 (A) and (B). Of significance in deciding the appropriate sanction to be imposed in this matter is the fact that Judge Cawood made no finding of fraud and our conclusion that this finding was not clearly erroneous. Obviously, had a finding of fraud been supported by the evidence, disbarment would follow as a matter of course absent compelling extenuating circumstances. *See, e.g., Attorney Griev. Comm'n v. Bailey,* 294 Md. 526, 536, 451 A.2d 1210, 1214 (1982); *Maryland St. Bar Ass'n v. Agnew,* 271 Md. 543, 553, 318 A.2d 811, 817 (1974).

In light of the sanction to be imposed, we find it unnecessary to address the exceptions taken by Collins and Bar Counsel regarding the issue of merger of violations of certain Disciplinary Rules.

John Sellers Collins shall stand suspended from the practice of law in this State for a period of one year accounting from 30 days from the date of this opinion. He shall stand

suspended beyond that date unless and until all costs incurred in connection with this proceeding are paid in full.

> *It is so ordered; respondent shall pay all costs, including all costs of transcripts, pursuant to Maryland Rule BV15 c, for which sum judgment is entered in favor of the Attorney Grievance Commission against John Sellers Collins.*