783 A.2d 656

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND,**

v.

**Jeffrey Christopher HINES.**

**No. 58, Sept. Term, 2000.**

Court of Appeals of Maryland.

Oct. 17, 2001.

278

Melvin Hirshman, Bar Counsel and Raymond A. Hein, Assistant Bar Counsel for the Attorney Grievance Commission of Maryland, for petitioner.

Selig Solomon, Esquire of Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BELL, Chief Judge.

The Attorney Grievance Commission of Maryland (AGC), the petitioner, acting through Bar Counsel and at the direction of the Review Board, filed, pursuant to Maryland Rule 16–709,[1] a Petition for Disciplinary Action, alleging violations of Rules 1.7[2] and 5.1(c)[3] of the Maryland Rules of Professional

---

**1.** Maryland Rule 16–709, as relevant, provides:

"a. Who may file. Charges against an attorney shall be filed by the Bar Counsel acting at the direction of the Review Board."

Effective July 1, 2001, the commencement of disciplinary proceedings is governed by Maryland Rule 16–571, which, as pertinent, provides:

"(a) Commencement of disciplinary or remedial action.—Upon approval of the [Attorney Grievance] Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals."

**2.** Maryland Rule of Professional Conduct 1.7 (Conflict of interest: General rule.) states as follows:

"(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

"(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

"(2) each client consents after consultation.

"(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

Conduct, Maryland Rule 16–812, by Jeffrey C. Hines, Esquire, the respondent.[4]   In accordance with Maryland Rule 16–709(b),[5] this Court referred the matter to Judge Evelyn Omega Cannon of the Circuit Court for Baltimore City to conduct an evidentiary hearing and to make findings of fact and draw conclusions of law.   After the evidentiary hearing was conducted, Judge Cannon, consistent with Rule 16–711(a),[6] filed Findings of Fact and Conclusions of Law, in which she found by clear and convincing evidence, and concluded, that the respondent violated Rules 1.7 and 5.1(c). Having independently examined the record, we are satisfied that it supports Judge Cannon's findings of facts and conclusions of law.   Accordingly, we shall overrule the respondent's exceptions and order him indefinitely suspended from the practice of law, with the right to seek readmission after six months.

The genesis of this disciplinary proceeding was a complaint filed by Richard Lowitz, a co-investor with the respondent in

---

"(1) the lawyer reasonably believes the representation will not be adversely affected;  and

"(2) the client consents after consultation.

"(c) The consultation required by paragraphs (a) and (b) shall include explanation of the implications of the common representation and any limitations resulting from the lawyer's responsibilities to another, or from the lawyer's own interests, as well as the advantages and risks involved."

3.   Maryland Rule 5.1(c) (Responsibilities of a partner or a supervisory lawyer.) provides:

(c) A lawyer shall be responsible for another lawyer's violation of the rules of professional conduct if:

(1) the lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved;  or

(2) the lawyer is a partner in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

4.   Mr. Hines was admitted to the Bar of this Court in December of 1972.

5.   Effective July 1, 2001, the applicable rule is 16–752.

6.   Now, as of July 1, 2001, Rule 16–757.

Network Computer Systems, Inc. ("NCS"). Sometime in 1990, Mr. Lowitz and Francis Folefac responded to an advertisement the respondent had placed to rent space at 2206 North Charles Street, Baltimore, Maryland.[7] Upon learning that Mr. Lowitz and Mr. Folefac wanted the space for a computer networking business they intended to form, the respondent, after discussions with them, joined in establishing the business, which was incorporated as NCS and in which each of the principals owned a one-third interest. The new company occupied space at the respondent's North Charles Street property, without charge, until some time in 1996.

The Articles of Incorporation for NCS were prepared by Mr. Aaron Weinrauch, an associate at the respondent's law firm. Mr. Weinrauch testified that he had just completed a Masters Degree in Corporation Law at George Washington University and recognized the conflict that the business relationship caused for the respondent and his new business associates. Therefore, Mr. Weinrauch testified further, he prepared, typed, and circulated a Waiver of Conflict of Interest Form and conducted several conversations with both Mr. Lowitz and Mr. Folefac concerning the form. Judge Cannon found that neither Mr. Lowitz nor Mr. Folefac had any reason to believe that the Waiver of Conflict of Interest Form waived any conflict beyond the drafting of the Articles of Incorporation.

Ms. Barbara Berger, the respondent's paralegal, testified contradictory to Mr. Weinrauch, claiming that, as she typed the Waiver of Conflict of Interest Form, she explained to Mr. Lowitz and Mr. Folefac that they should seek legal counsel. Judge Cannon did not credit Ms. Berger's testimony, finding her demeanor in court to be poor and that the substance of her testimony lacked credibility.

The Articles, which were filed with the Charter Division of the Maryland State Department of Assessments and Taxation

---

7. The parties agreed that NCS would occupy space at this location, separate and apart from the quarters occupied by the respondent's law practice and it did.

("SDAT"), identified the respondent as the corporation's resident agent, sole incorporator, and sole director. Neither they nor other corporate documents specified the respondent's exact role in NCS; however, based on the evidence presented, Judge Cannon found that the respondent was active in NCS and familiar with the financial condition and operation of the corporation at least through October 1994.

Apparently, the corporation operated informally. It issued no actual shares of stock and held no annual meeting of stockholders. The officers were never formally elected; however, it was agreed that Mr. Lowitz would be the administrator and outside sales representative for NCS, Mr. Folefac would give technical support, and the respondent would help to obtain funding. Some of the funding for NCS the respondent provided himself. Other funding he obtained from his wife, Helene Hines, and an unidentified friend.

Mrs. Hines made at least two loans to NCS in 1992. On each occasion, at the request of associates in the respondent's firm, the respondent's paralegal, Ms. Berger, who was at all times supervised by the respondent, prepared confessed judgment promissory notes securing the loans. The respondent was an obligor on only one of those loans, the loan to NCS, Richard Lowitz, Francis Folefac and the respondent, made prior to March 1992 in the amount of $25,000.00, "for continuation of" NCS. This loan was repaid in full.

The respondent's wife made another loan to NCS on or about December 24, 1992, this one in the amount of $5,000.00. This loan was secured by a confessed judgment note, naming only NCS, Mr. Lowitz and Mr. Folefac as obligors, but containing on the signature page, in addition to spaces for the obligors, a space for the respondent's signature. Both Mr. Lowitz and Mr. Folefac signed the note as obligors, and Mr. Lowitz signed for NCS. The respondent did not sign the note. Despite disagreement as to the amount owed, it is undisputed that the loan was not repaid according to its terms and that there remains a balance due Mrs. Hines.

Judge Cannon found that Mr. Lowitz did not know until almost two years later, some time after October 1994, that the

respondent had not signed the note and that, by its terms, he was not liable on it. She also found that the respondent, by providing a signature line for himself although he was not an obligor on the note, was trying to, and did, "pull a fast one." Judge Cannon did not find credible the respondent's explanation, offered through his and his paralegal's testimony, for not signing the note or being an obligor on it.

Notwithstanding that in her testimony Ms. Berger volunteered repeatedly, without being asked, that a Waiver of Conflict of Interest Form was prepared by her and executed by Mr. Lowitz and Mr. Folefac each time a promissory note was prepared, Judge Cannon found that the only Waiver of Conflict of Interest Form relating to NCS prepared by anyone in Mr. Hines' firm was the one Mr. Weinrauch prepared and presented to Mr. Lowitz and Mr. Folefac when he drafted NCS's Articles of Incorporation. Moreover, Mr. Weinrauch was not an employee of the respondent's firm when most, if not all, of the promissory notes were prepared and signed. He had left the respondent's law firm in October 1992 and returned three or four years later, thus explaining his absence when these other potential Waiver of Conflict of Interest Forms would have been prepared. Both the respondent and Ms. Berger testified that the file containing the other executed Waiver of Conflict of Interest Forms had been stolen. Judge Cannon found the respondent's and Ms. Berger's testimony on this point unconvincing, concluding that the other waiver forms never existed.[8]

On September 21, 1993, Edward Christman, an associate in the respondent's law firm, filed a complaint[9] for confessed

---

**8.** The respondent and Ms. Berger testified that, on occasion, both Mr. Lowitz and Mr. Folefac had keys to the firm and came after hours when no one else was present to work on law firm computer software. Judge Cannon noted that, upon learning of the alleged theft, the respondent did not file a report with the police, change the locks, or take any other corrective action.

**9.** The complaint was filed in the Circuit Court for Baltimore City and carried the case name *Helene Hines v. Network Computer Systems, inc., Richard Lowitz and Francis Folefac.*

judgment against NCS, Mr. Lowitz, and Mr. Folefac on behalf of Mrs. Hines. Judge Cannon noted, "Although Mr. Christman was the attorney of record for the case and reviewed the pleadings, they were prepared by Ms. Berger, who also signed Mr. Christman's name with his approval." Further, Judge Cannon found that neither the respondent, Mr. Christman, nor anyone else in the respondent's firm discussed the matter with Mr. Lowitz or Mr. Folefac prior to filing the Confessed Judgment. Ms. Berger's testimony, and that of the respondent, to the contrary was rejected. In fact, Judge Cannon determined that Mr. Lowitz learned of the complaint only when it was served on him. She also concluded:

"Mr. Lowitz testified that when he received the papers he called Respondent and asked him what he was doing. Respondent did not dispute that this call took place. According to Mr. Lowitz, Respondent told him that he need not do anything, need not go to court, need not write a letter or otherwise respond and that he filed the complaint only to 'cover his rear' with his wife. Respondent did not recommend that Mr. Lowitz seek the advice of independent counsel. Mr. Lowitz called Respondent because at that time he still considered him to be a part of NCS, as director, shareholder, and attorney."

The trial court found that on three occasions from January through October of 1994,[10] Daniel Tisdale, an attorney then employed by the respondent, requested that the Clerk of Court reissue process for service on NCS, Mr. Lowitz, and Mr. Folefac. On November 14, 1994, a return of service containing an affidavit by Mr. Tisdale was filed. The affidavit attested that Mr. Tisdale served all three defendants on or about October 25, 1994.

Judge Cannon concluded that despite his firm's involvement in litigation on behalf of Mrs. Hines and in which the corporation of which he was a one third owner and the persons with whom he was associated in the venture were defendants, the

---

10. The three letters were dated January 25, 1994, March 18, 1994, and October 18, 1994.

respondent did not "resign or alter his involvement with NCS" prior to October 1994. In so concluding, Judge Cannon did not credit the respondent's or Ms. Berger's testimony that, on April 26, 1993, Ms. Berger drafted a letter of resignation that the respondent asked her to draft four months earlier. Judge Cannon found instead "that the letter, if drafted on April 26, 1993, was never sent nor was there ever any other indication from Respondent to Mr. Lowitz or Mr. Folefac that he was resigning from his involvement in NCS."

Further indication of the respondent's failure to resign before October 1994, Judge Cannon noted, was that the respondent, who was listed in NCS's corporate papers as the sole incorporator, sole director and resident agent, did not notify SDAT of his resignation from NCS and that, after his alleged resignation, the respondent signed at least three checks drawn on NCS's corporate account, all made payable to Mrs. Hines in payment of the indebtedness on the December 1992 loan. Judge Cannon rejected, as unbelievable, the respondent's testimony that he signed the checks because Mr. Lowitz and Mr. Folefac asked him to do so, as acknowledgment that NCS was making payment to Mrs. Hines on the loan.

Judge Cannon also noted some laxity in the manner in which the respondent's firm handled Mrs. Hines' matter. She pointed out that, although a confessed judgment was entered against NCS and Messrs. Lowitz and Folefac on September 21, 1993, no action was taken to enforce it until more than two years later in December 1995. Nor was service on the defendants expeditiously accomplished. As Judge Cannon found, the defendants were not served even though:

"During all this time [the period between January 25, 1994 and October 25, 1994], NCS was still located at the respondent's building at 2206 North Charles Street, and at the time the complaint was filed, the respondent's law firm was still in the same building as NCS. It was not until December 1993 that the respondent moved his law practice a few blocks away to 2423 Maryland Avenue."

Judge Cannon concluded her Findings of Fact by observing:

"It is clear that the informal way in which the corporation was operated included financial decisions. Respondent proffered evidence of several such instances: a check made payable to Mr. Lowitz with a notation that it was repayment of a loan, although Mr. Lowitz allegedly never made a loan to the company; Mr. Folefac's trip to Cameroon at the expense of NCS, even though NCS allegedly had no business there; and Mr. Lowitz allegedly purchased a personal car with NCS funds. Some of the events are alleged to have occurred after Respondent claims he had resigned and did not know how the business was being operated. This Court is not deciding whether these particular transactions did or did not occur, or were or were not proper. However, this Court does find that NCS had financial difficulties throughout its short life and that Respondent was intimately aware of those difficulties due to his active participation in the affairs of the corporation."

Judge Cannon concluded as a matter of law that the respondent violated Rules 1.7 and 5.1(c). In support of those conclusions, she reasoned:

"Respondent was active as a director in NCS and had an ongoing attorney client relationship with NCS from the time of the preparation of the Articles of Incorporation through sometime after October 1994, when Respondent advised Mr. Lowitz that nothing needed to be done after Mr. Lowitz was served with the Complaint for Confessed Judgment. In addition to Articles of Incorporation, Respondent's law firm prepared confessed judgment promissory notes in connection with the two loans described above made to NCS by Respondent's wife. The preparation of the notes constituted the practice of law because they were documents affecting a case that could have been filed in court. Business Occupations and Professions Art., Section 10–101(h)(2)(iii).

"As discussed above, Respondent held a one-third interest in NCS, according to the Articles of Incorporation, and he was the sole director, from beginning to end, see Corporations and Associations Article, Sections 2–404(a) and 2–405, and continued to remain active in the affairs of NCS as

attested to by his testimony concerning the financial situation of the company through 1994 and his signing corporate checks, at least through June 1994. Thus, Respondent owed a fiduciary responsibility to NCS, in addition to, and separate from, his obligation to NCS as its attorney.

"As the director of the corporation, Respondent knew that NCS needed to be represented in connection with the notes that his law firm drafted, and based on the history of the parties with the Articles of Incorporation, he knew that Mr. Lowitz and Mr. Folefac would have assumed that he was acting as counsel for NCS in drafting the documents (or permitting them to be drafted by lawyers whom he supervised). On the final loan from Mrs. Hines, Respondent did not incur any individual liability but had his law firm prepare documents obligating the other two principals. With respect to that note, he clearly represented himself, his wife and NCS. In addition, Respondent did not make it clear to Mr. Lowitz and Mr. Folefac that he did not personally represent them, although they may well have operated on that assumption based on the surrounding circumstances.

"Neither Respondent nor anyone else in his law firm advised Mr. Lowitz or Mr. Folefac of a possible conflict of interest in connection with the signing of the promissory notes. As discussed above, there was only one Waiver of Conflict of Interest form signed and by its terms is related solely to the drafting of the Articles of Incorporation. Additionally, as discussed above, Mr. Lowitz and Mr. Folefac had no reason to believe that the waiver applied to the loans from Mrs. Hines.

"Further Respondent had a conflict of interest when his associate filed the Complaint for Confessed Judgment. At that time Respondent was not only the sole director of NCS, he was still listed with [the] Department of Assessments and Taxation as the resident agent. When the suit was filed, Respondent stated that he had concerns about financial improprieties on the part of Mr. Lowitz and Mr. Folefac and did nothing to protect the corporate assets. Also, as this Court found at the time the suit was filed against the

corporation, Respondent was active in the affairs of the corporation.

"In addition to failing to properly represent NCS, his firm could not and did not properly represent Mrs. Hines. He did nothing to take action to help her secure assets, although he thought inappropriate self-dealing was taking place. He did not advise her with respect to collection measures or take any such measures even after a suit was filed. And of course, had he so advised her, any actions would have had an adverse impact on NCS, to which he owed a fiduciary obligation.

"Respondent clearly acted as the attorney for NCS when Mr. Lowitz called him and requested advice after being served with the complaint. At that time, Respondent's law firm represented the plaintiff, and thus in advising Mr. Lowitz, he was representing both the plaintiff and the defendant. He advised Mr. Lowitz not to take any action on behalf of the corporation. If he did not consider himself counsel, when Mr. Lowitz called, he should have immediately told Mr. Lowitz that he needed to seek the advice of independent counsel because Respondent's law firm represented the plaintiff. Of course, even filing the suit was a breach of a duty to the corporation as he was still the corporation's director. Additionally, Respondent was acting as counsel for Mr. Lowitz personally by giving him that advice, since Mr. Lowitz also was a named defendant and Respondent did not advise him that he did not represent him.

"Because Respondent was prohibited from representing both his wife and NCS and/or Mr. Lowitz and Mr. Folefac, therefore Edward Christman's representation of Mrs. Hines was also prohibited. Rule 1.10(a) ("While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8, 1.9 or 2.2.") Under 5.1(c), Respondent, as supervising attorney, is responsible for the actions of Ms. Berger and Mr. Christman."

The petitioner has taken no exceptions to the findings of fact made, or the conclusions of law drawn, by Judge Cannon although it does offer a recommendation as to sanction. Both the court's findings of fact and conclusions of law are the subject of exceptions filed by the respondent. With respect to the former, the respondent takes issue with the court's finding that an attorney-client relationship existed between him and the "complainant," whom he identifies as Mr. Richard Lowitz.[11] In support of the exception, he reviews at great length the testimony of the various witnesses as to the inception of the respondent's business relationship with Mr. Lowitz and Mr. Folefac, the founding of NCS, the loan transactions involving the respondent's wife, especially the last such agreement, and the circumstances surrounding the execution of the notes, the filing of the confessed judgment action on behalf of the respondent's wife against the company and the other two of its principals, and the respondent's relationship to NCS and the other principals, both before and after those proceedings were filed. In so doing, despite the court's having resolved issues of credibility, the respondent emphasizes that evidence consistent with his position.

---

**11.** In paragraph A. of his exceptions to Judge Cannon's findings of fact, the respondent quite clearly focuses on the findings about which he is concerned: "In her findings of fact, Judge Cannon states that Respondent had an attorney-client relationship with the complainant and that Respondent performed legal functions for the complainant creating a conflict of interest. Such assertions are totally without substantiation and have no basis in fact as shown in the testimony of the participants at the hearing." In paragraph B. of the exceptions, he identifies Richard Lowitz as the complainant. To be sure, Judge Cannon found that the respondent had an attorney client relationship with the other principal in the business venture in which the respondent and Mr. Lowitz were involved, Mr. Folefac, and with the corporation that they started and, as Judge Cannon also found, operated. Although he rehearses in some detail the testimony of the various witnesses, except for stating in the concluding paragraph of the section that "[d]uring the entire association of Respondent with NCS and the other parties of the company, neither he nor his law firm were ever engaged as counsel for the company or individually by the parties," the focus is always on the finding that the respondent and Mr. Lowitz had an attorney client relationship.

The respondent also takes issue with Judge Cannon's conclusion that he violated Rule 1.7 [12] by representing multiple parties with conflicting interests. He maintains that he did not have, and never had, an attorney client relationship with NCS or with any of its principals individually. Moreover, the respondent states that the accuracy of his argument is confirmed by the testimony of the witnesses to the events and transactions in which the parties were involved and which form the basis for the complaint.

We approach the review of the sufficiency of the findings of fact and conclusions of law of the hearing court aware that it is this Court that finally determines whether an attorney has engaged in misconduct. *Attorney Griev. Comm'n v. Sheridan,* 357 Md. 1, 17–18, 741 A.2d 1143, 1152 (1999); *Attorney Griev. Comm'n v. Glenn,* 341 Md. 448, 470, 671 A.2d 463, 473 (1996). When there are exceptions to the findings of fact made by the hearing judge, although we give appropriate deference to those findings, we independently review the complete record, paying particular attention to the evidence related to the disputed factual finding. *Glenn,* 341 Md. at 470, 671 A.2d at 473; *Bar Ass'n v. Marshall,* 269 Md. 510, 516, 307 A.2d 677, 680–81 (1973). It is well settled that, because he or she is in the best position to assess first hand a witness's credibility, *see Glenn,* 341 Md. at 470, 671 A.2d at 474; *Attorney Griev. Comm'n v. Bakas,* 323 Md. 395, 402–03, 593 A.2d 1087, 1091 (1991), the factual findings of the assigned judge in an attorney disciplinary proceeding "are prima facie correct and will not be disturbed on review unless clearly erroneous." *Glenn,* 341 Md. at 470, 671 A.2d at 473. *See also Attorney Griev. Comm'n v. Kemp,* 303 Md. 664, 674, 496 A.2d 672, 677 (1985); *Attorney Griev. Comm'n v. Collins,* 295 Md. 532, 548, 457 A.2d 1134, 1142 (1983); *Attorney Griev. Comm'n v. Kahn,* 290 Md. 654, 679, 431 A.2d 1336, 1350 (1981). Thus, factual findings that are supported by clear and convincing

---

12. The respondent does not challenge the court's conclusion that he violated Rule 5.1(c), presumably because, if there is no conflict of interest, the supervisory issue is moot.

evidence will not be disturbed. In determining whether the findings have that level of support, we recognize that the judge "may elect to pick and choose which evidence to rely upon" and that "an attorney in a disciplinary proceeding need only establish factual matters in defense of an attorney's position by the preponderance of evidence, including whether mitigating circumstances existed at the time of the alleged misconduct." *Sheridan*, 357 Md. at 17–18, 741 A.2d at 1152, quoting *Attorney Griev. Comm'n v. Powell*, 328 Md. 276, 288, 614 A.2d 102, 108 (1992).

Judge Cannon found, after a full hearing, at which the witnesses on whose testimony the respondent relies were heard and observed, that the respondent was an active director in, and had an ongoing attorney-client relationship with, NCS and with Mr. Lowitz, at least insofar as the respondent gave Mr. Lowitz advice in regards to the confessed judgment action filed by the respondent's wife against the corporation, and with Mr. Lowitz and Mr. Folefac. Moreover, Judge Cannon found that the respondent's law firm prepared the Articles of Incorporation for NCS, as well as promissory notes for two loans from the respondent's wife to NCS and its principals. There was, despite the respondent's and his law firm's involvement with NCS and its principals, only one Waiver of Conflict of Interest Form that was signed by all of the parties and that form related solely to the preparation of the Articles of Incorporation for NCS. The evidence offered by the respondent to establish that other Conflict of Interest Forms were executed by the parties in connection with the subsequent transactions in which the respondent was involved and for which his law firm performed legal tasks was rejected by Judge Cannon as not credible. In fact, and in particular, Judge Cannon found the testimony of the respondent and his paralegal, Ms. Berger, generally not worthy of belief. Thus, Judge Cannon found that the respondent did not advise NCS or Mr. Lowitz and Mr. Folefac when they signed the promissory notes that there was a possible conflict.

There also was a conflict of interest, Judge Cannon concluded, when, while respondent was still an active director, stock-

holder and the resident agent of NCS, his firm filed the Complaint for Confessed Judgment against the corporation and Mr. Lowitz and Mr. Folefac. That conflict was exacerbated, she found, when, after the complaint was filed by his law firm, the respondent advised Mr. Lowitz, in a telephone call made by Mr. Lowitz on behalf of NCS and himself, that Mr. Lowitz need not do anything in response to the confessed judgment action. Finally, Judge Cannon found that the respondent, through his firm, in addition to providing NCS and its principals deficient representation, "could not and did not properly represent [the respondent's wife]." This was made clear by the unexplained delay in obtaining service on the defendants even though the corporate offices were located in the respondent's building and the respondent was still active in the company.

Our independent review of the record convinces us that the respondent has failed to overcome Judge Cannon's findings of fact and that Judge Cannon's findings are supported by clear and convincing evidence. Accordingly, the respondent's exceptions to Judge Cannon's findings of fact are overruled.

The respondent's challenge of Judge Cannon's conclusions of law is fact based and, thus, depends upon the success of his exceptions to her fact finding; to prevail, the factual basis of the legal conclusions must be undermined. The fact finding of the hearing judge, we have held, was not clearly erroneous. Thus, the respondent fares no better with regard to his exceptions to the hearing judge's conclusions of law. These exceptions too are overruled.

With regard to the latter, we observe, moreover, that while an actual conflict of interest is a clear violation of Rule 1.7, the appearance of a conflict of interest may constitute an ethical violation, under some circumstances. *Attorney Griev. Comm'n v. Kent*, 337 Md. 361, 653 A.2d 909 (1995). The comment to Rule 1.7 states that:

> "*Loyalty to a client.*—Loyalty is an essential element in the lawyer's relationship to a client. An impermissible conflict

of interest may exist before representation is undertaken, in which event the representation should be declined. If such a conflict arises after representation has been undertaken, the lawyer should withdraw from the representation. . . .

"As a general proposition, loyalty to a client prohibits undertaking representation directly adverse to that client without that client's consent. . . . Thus, a lawyer ordinarily may not act as advocate against a person the lawyer represents in some other matter, even if it is wholly unrelated."

Thus, "in order to maintain public confidence in the legal system, lawyers must avoid not only actual acts of misconduct but even the type of behavior that can suggest misconduct." *Id.* at 382, 653 A.2d at 919. This is such a circumstance.

We now consider the question of the appropriate sanction. Addressing that issue, we said in *Attorney Griev. Comm'n v. Franz,* 355 Md. 752, 760–61, 736 A.2d 339, 343–44 (1999) (quoting *Maryland St. Bar Ass'n v. Agnew,* 271 Md. 543, 549, 318 A.2d 811, 814 (1974)), that:

"It is well-settled that the purpose of disciplinary proceedings is to protect the public rather than to punish the erring attorney. . . . The public interest is served when this Court imposes a sanction which demonstrates to members of the legal profession the type of conduct that will not be tolerated. . . . By imposing such a sanction, this Court fulfills its responsibility 'to insist upon the maintenance of the integrity of the Bar and to prevent the transgression of an individual lawyer from bringing its image into disrepute.' . . . Therefore, the public interest is served when sanctions designed to effect general and specific deterrence are imposed on an attorney who violates the disciplinary rules. . . . Of course, what the appropriate sanction for the particular misconduct is, in the public interest, generally depends upon the facts and circumstances of the case. . . . The attorney's prior grievance history, as well as facts in mitigation, constitute[ ] part of those facts and circumstances."

(citations omitted).

Bar Counsel recommends that the respondent be suspended from the practice of law for one year. He relies on certain of

the Standards for Imposing Lawyer Sanctions adopted by the American Bar Association,[13] the fact that the respondent previously has been reprimanded, and the precedent of *Attorney Griev. Comm'n v. Collins*, 295 Md. 532, 457 A.2d 1134 (1983). In *Collins*, the Court suspended Collins, who was the managing partner of the selling group, for representing both the buyer and the seller of a liquor license, but failing to protect the buyer's interest and to advise the buyer of his options when it was learned that the license being purchased had expired.

The respondent seeks dismissal but submits that, if that sanction is not appropriate because his exceptions are overruled, "a minor notation would be all that is justified," because the conflict of interest in this case "was exceptionally minor with no harmful effect." We interpret, in the context, "minor notation" to mean a reprimand.

■ We do not agree with the respondent that the conflict of interest in this case was exceptionally minor; rather, we think it quite serious. Indeed, as we have mentioned, it is of the sort where the appearance itself could constitute an ethical violation. We are also troubled by the finding that the respondent "was trying to, and did, 'pull a fast one' " in connection with the last of the loans made by his wife, when the loan document had a signature line for him but the agreement did not include him as obligor. Moreover we think it appropriate, as Bar Counsel points out, that the respondent's prior disciplinary involvement and sanction be taken into account.

---

13. Section 4.32 of the Standards for Imposing Lawyer Sanctions generally provides for suspension when "a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client." Section 4.62 generally calls for suspension "when a lawyer knowingly deceives a client, and causes injury or potential injury to the client." Among the aggravating factors recognized by Section 9.22 are "prior disciplinary offenses," submission of false evidence, false statements, or other deceptive practices during the disciplinary process," and "refusal to acknowledge wrongful nature of conduct."

On the other hand, we do not believe it appropriate to penalize the respondent for maintaining his innocence. That he does so, advancing arguments that the hearing judge rejected and then offering those same arguments to us by way of exceptions that we also reject, and does not, as a fall back position, express remorse, is not an aggravating factor to be used in determining the proper sanction.

We believe, on balance, that the respondent's violation of Rules 1.7 and 5.1(c) warrants his indefinite suspension from the practice of law, with the right to apply for readmission six months from the date of his suspension, which shall commence thirty days after this opinion is filed.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRAN-SCRIPTS, PURSUANT TO MARYLAND RULE 16–761(b), FOR WHICH SUM JUDGMENT IS ENTERED IN FA-VOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST JEFFREY C. HINES; RE-SPONDENT'S SUSPENSION SHALL COMMENCE THIRTY DAYS FROM THE FILING OF THIS OPINION.**