955 A.2d 269

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Craig KIMMEL.

Attorney Grievance Commission of Maryland

v.

Robert Silverman.

Misc. Docket AG Nos. 20, 21 Sept.Term, 2007.

Court of Appeals of Maryland.

Sept. 2, 2008.

Gail D. Kessler, Asst. Bar Counsel (Melvin Hirshman, Bar Counsel, Atty. Grievance Com'n of Maryland), for Petitioner.

Charles Martinez (Eccleston and Wolf, P.C.), Baltimore, MD, for Respondents.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, JJ., and JOHN C. ELDRIDGE and IRMA S. RAKER, JJ. (Retired, specially assigned).

HARRELL, Judge.

These attorney disciplinary actions examine alleged shortfalls by partners in a law firm in supervision of a relatively-inexperienced associate and client communication that followed the establishment by their out-of-state law firm of a beachhead office in Maryland. To extend its automobile warranty and "lemon law" civil practice into the Maryland market, Kimmel & Silverman, P.C. ("K & S") hired a young Maryland attorney to open a branch of the Pennsylvania-based firm in Owings Mills, Maryland. When matters ultimately went to Hades in a handbasket with the associate's handling of the firm's practice in the Maryland office, the Attorney Grievance Commission of Maryland (the "Commission") asserted its disciplinary authority over K & S's founding partners Robert Silverman and Craig Kimmel ("Respondents"),[1] pursuant to Maryland Rule of Professional Conduct (MRPC) 8.5(a)(2)(i) and (iii).[2] Respondents concede the Commission's authority to act in the matter.

Through Bar Counsel, the Commission charged Respondents with failure to supervise adequately the Maryland asso-

---

1. Neither Silverman nor Kimmel is admitted to the practice of law in Maryland.

2. MRPC Rule 8.5 (Disciplinary Authority) provides, in relevant part:

 (a)(2) A lawyer not admitted to practice in this State is also subject to the disciplinary authority of this State if the lawyer
 (i) provides or offers to provide any legal services in this State, or
 . . .

ciate employed by the firm, in violation of MRPC 5.1.[3] The Commission also charged Respondents, in the aftermath of the associate's hasty resignation, with failure to properly communicate with a Maryland client of the firm, in violation of MRPC 1.4.[4]

The matters were assigned by this Court to Judge Kathleen Gallogly Cox of the Circuit Court for Baltimore County for an evidentiary hearing on the charges and rendition of findings of fact and recommended conclusions of law. The hearing was conducted on 21 and 25 February 2008. Judge Cox filed her written opinion on 26 March 2008.

## I. Overview

Respondents founded Kimmel & Silverman, P.C., in Ambler, Pennsylvania in 1991. The firm's practice focuses almost

---

 (iii) has an obligation to supervise or control another lawyer practicing law in this State whose conduct constitutes a violation of these Rules.

Unless otherwise provided, all Rule references in this opinion are to the Maryland Rules of Professional Conduct (MRPC) (2007, 2008 Repl. Vol.).

**3.** MRPC 5.1 (Responsibility of Partners, Managers, and Supervisory Lawyers) provides:

 (a) A partner in a law firm, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm, shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the Maryland Lawyers' Rules of Professional Conduct.

 (b) A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Maryland Lawyers' Rules of Professional Conduct.

**4.** MRPC 1.4 (Communication) provides:

 (a) A lawyer shall:

 (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(f), is required by these Rules;

 (2) keep the client reasonably informed about the status of the matter;

 (3) promptly comply with reasonable requests for information

 (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

exclusively on the prosecution of motor vehicle warranty and "lemon law" civil claims. Both founders were admitted to the Pennsylvania Bar in 1989, and later admitted to the New York Bar. In addition, Silverman was admitted to practice in New Jersey and Kimmel in Massachusetts. As noted earlier, neither is admitted to the practice of law in Maryland.

On the day of the initial employment interview in June 2004, K & S hired Maryland attorney Robin Katz to establish a Maryland office for the firm. She became the sole K & S employee in the Maryland office and remained so for 12–and–one–half months of her 13–month tenure with the firm.

Katz's first purported supervisor was Robert Rapkin, a managing attorney in the K & S home office in Ambler, Pennsylvania.[5] Katz spent her first month of employment in orientation in the Ambler office. She was taught the firm's method for preparing and evaluating cases, introduced to the firm's computerized case management system, and assisted in modifying the firm's basic pleadings forms for use in Maryland. Later, in response to what became a growing "backlog" in the Maryland office near the end of Katz's time with the firm, Kimmel assumed direct supervisory responsibility over her, but to little avail, as we shall explain.

During the latter half of her time with K & S, Katz failed to respond to motions compelling discovery in 47 cases filed by her on behalf of K & S's Maryland clients. As a result, those cases were dismissed with prejudice. She resigned abruptly from the firm in August 2005. She consented to disbarment in Maryland as the sanction for her misconduct.

## II. Findings of Fact and Conclusions of Law

In her written opinion, Judge Cox made the following factual findings, based on a clear and convincing evidentiary standard:

> From the inception of the firm, K & S handled cases in both Pennsylvania and New Jersey. Some time after 2000,

---

5. Rapkin was not admitted to practice law in Maryland.

K & S expanded into other jurisdictions, to include New York and Massachusetts.

K & S handles Lemon Law cases as a high volume practice. The applicable fee shifting statutes provide an incentive to automotive manufacturers to settle, as does the desire to promote customer satisfaction. In the experience of both Kimmel and Silverman, approximately 99% of their cases settle, if handled properly. K & S is organized in various teams that are supervised by one of the partners or a senior attorney. The firm relies extensively on paralegals and its own mechanical experts to manage high volume attorney caseloads.

In 2004, K & S decided to expand into Maryland. Although Kimmel and Silverman considered associating with a Maryland practitioner with experience in the Lemon Law field, they were unable to find a suitable candidate. Therefore they decided to hire and train an attorney to start up their Maryland practice.

Robin Katz responded to a web site job posting by K & S. After forwarding her resume and a cover letter, she received a call from K & S and was scheduled for an interview with Robert Rapkin. Rapkin began with the firm in approximately 2001. He manages his own caseload and has supervisory responsibility over one of the "teams" of lawyers, paralegals, and other support staff within the firm.

Katz was first admitted to practice in Maryland in December 1996. From 1996 through 2003, Katz handled social security disability cases for Health Management Associates ("HMA") in a non-adversarial administrative law setting. Katz was hired in 2003 by Health Education Resource Organization ("HERO") as a staff attorney. Katz remained at HERO for approximately nine months.

When Katz interviewed at K & S in June 2004, she had no civil trial experience. However Katz had high volume work experience, and she had handled uncontested administrative and masters hearings. Rapkin conducted an interview and followed up with reference checks, including contact with administrative judges before whom Katz had tried cases.

Katz was described as competent, well organized, and capable of handling a large caseload. Her former employer at HMA described her as someone capable of managing her own office. Rapkin knew that Katz had no jury trial experience, although he was unaware that she also had not handled contested matters. Rapkin also knew that Katz had managed a caseload of 200 to 300 social security cases. Overall, he thought Katz appeared to be a nice and competent individual who was capable of handling the job.

Katz received and accepted an offer from K & S on the same day as her interview. She spent the next month in the K & S home office in Ambler, Pennsylvania, where she was trained to handle Lemon Law cases. During that time, Rapkin took Katz with him to a couple of depositions and arbitrations. He also assisted her to develop Maryland forms for basic pleadings. She was trained on the firm method for preparing and evaluating cases. Katz met most of the K & S lawyers and staff, and she spent time with both Kimmel and Silverman.

K & S utilizes "Time Matters," which is a computerized calendaring/database system. K & S policy requires that time sensitive matters be entered into Time Matters when they are received, at which time the due dates for deadlines and responses are calendared. The Time Matters system sends automated reminders of deadlines to the responsible lawyers and paralegals. Additionally, it enables supervising attorneys to monitor to ensure that case deadlines are met. Lisa Graham, who serves as the K & S Office Manager, along with IT staff, trained Katz on the use of Time Matters during her orientation at the Ambler, Pennsylvania, office. Katz acknowledges that she was trained on the Time Matters system. She described it as a tickler or calendaring system. She was well aware of her responsibility to input matters she received into the calendaring system.

After the month training period, Katz returned to Maryland. Katz made arrangements to procure office space and open an office in Owings Mills. Katz was the only person in the office. She shared equipment and some common space

with other unrelated entities. Additionally, she had the shared use of a receptionist to answer and transfer calls. Katz was responsible for her all of her own clerical work.

Katz understood that she would not have a paralegal in Maryland at the outset. She knew, however, that she would have access to paralegal assistance through Pennsylvania. She was led to believe that K & S would hire a paralegal for the Maryland office once it had a sufficient caseload.

K & S had begun to accept Maryland cases while Katz was still training in Pennsylvania. It was her belief that there existed approximately fifty Maryland cases by the time she opened the office in Maryland. Katz immediately started drafting Maryland complaints based upon Pennsylvania forms that she adapted to Maryland law.

Testimony and exhibits clearly reflect that K & S operates a volume practice in a number-driven environment. The overt emphasis on attorney numbers and expectations is pervasive in communications, and seems essential in the firm culture.

Starting in early September, K & S gave Katz a weekly benchmark for complaints to be filed. She was initially expected to put ten cases a week in suit, although that number increased in January 2005 to fifteen cases per week. In addition to the filing expectations, a specific revenue target of $10,000 per week in attorneys fees from settlements was established. This was confirmed to Katz in a November 23, 2004 e-mail from Rapkin, who initially supervised her work.

Katz's ability to meet her revenue expectations was the subject of a series of email exchanges, all of which emphasized the importance of this objective. In a particularly blunt exchange on November 29, 2004 from Rapkin, with copies to Silverman, Kimmel and the Office Manager, Katz was told:

> This is not what I want to see. The report you gave me says you settled 1 case in the last 2 weeks, and you have 224 cases. Let me make it clear, first and foremost,

you must make your number. The number you have is not set for fun, it has a very important purpose. Your number is the most important way we judge how to give raises, whether we can fund support staff for your office, and as a practical matter if all your cases come up for trial at the same time b/c they are not settled you won't be able to handle them all. Therefore, no excuses, don't call, no need to talk, just get on it and only call me with good positive news of settlements, or demands you are going to make.

The revenue quota was also documented in a memorandum outlining performance expectations for Katz in order for her to have a positive employment review. As stated in the Memorandum:

You have already been told our expectations of how much income we expect you to bring to the firm each week, *on a consistent basis.* Every weekly number is based upon 52 weeks a year. Each lawyer shall make certain that when he or she is on vacation or holiday, the settlements for the weeks before and after are not forgotten The attorney must make up the missing week/days settlements so the average income per week is still expected.

... Your weekly number starting the week of 01/03/05 is $10,000.00. So there is no confusion, we expect you to consistently bring to the firm $10,000.00 in attorney fee and cost receivables each week in order to have a positive review in June.

It is clear that Katz did not consistently meet her performance benchmarks. No adverse action was initiated by K & S. However the performance measures were a regular point of emphasis. In January 2005, Kimmel assumed supervisory responsibility over Katz. The emphasis on her numbers remained.

On February 8, 2005 and April 12, 2005, Silverman e-mailed Katz expressing concern that she was not settling cases with manufacturers other than Ford and Chrysler. On May 10, 2005, Kimmel followed up on this topic and

instructed Katz: "To break the backlog, I've decided to help you along." Kimmel directed Katz to send at least ten substantive letters three days per week to opposing counsel, and that unless Kimmel agreed in advance, this was "to be done without fail as instructed." As Kimmel described:

> I do not want form letters or correspondence that clearly shows the file has not been reviewed. Each letter should have substantial detail and/or a demand that applies accurately to that particular case. While you may disagree with this routine, watch what happens as a result. You will blow through your numbers, be better prepared for arbitrations and be in more frequent contact with clients. As a consequence, we can add another attorney and at least one paralegal. I want YOU to head up MD and make it a well-oiled machine, but allowing all manufacturers but two to largely ignore you while waiting for trial is NOT the way. Do what I ask and you will reap ALL the rewards of that labor, in ways you will find very beneficial.

Katz dutifully started sending out thirty letters per week, with copies forwarded to Kimmel three times per week. This continued from June 1, 2005 through the end of Katz's employment, except during vacation periods. On June 3, 2005 Kimmel again emailed Katz questioning the fees generated in her settlements, which were almost always $2,500 per case. In response to Katz's claim that most settlements were pre-suit, and fees would be larger in other cases, Kimmel commented:

> I for example, review every file every month, and it takes me about 30–60 minutes to update myself. Each month, between .5 and 1.0 are added to the file for that alone. Then there are issues that come up, protracted discussions, consultations with the experts and client, etc. No two cases are identical and so I expect that settlement of fees would be similar across the board, but not identical as they have been.

At the time, Katz had between 200 and 300 cases that would need such monthly review to follow this directive.

The issue of paralegal support for Katz was also a subject of continuing discussion. As early as September 23, 2004, Kimmel indicated that he agreed with Katz that the firm needed a "full time professional paralegal down there." It is clear that Katz could and did avail herself of paralegal support from the Pennsylvania office. This was not always a smooth process. In one e-mail exchange in October 2004, Katz noted instances where discovery mailed directly to Pennsylvania in Maryland cases was forwarded to her to handle just before responses were due. Part of the problem at that time was that the firm was using its Pennsylvania address on filings, so pleading were mailed there. Although this part of the difficulty was corrected, the coordination for support from Pennsylvania to Maryland was not always smooth. In late December, Katz inquired of the Office Manager whether there was any news about hiring a paralegal for Maryland. In response, she was reminded of the need to file fifteen complaints per week.

Once again on January 3, 2005, Katz asked Silverman where the firm stood on hiring a paralegal. In particular, she noted she was receiving five to ten sets of discovery each week, and that she had a number of motions hearings set. While she acknowledged the assistance she was receiving in Pennsylvania to draft complaints, she noted the need to arrange service, file affidavits of service, subpoena records, and communicate with clients.

There was at least one other occasion in April 2005 when Katz noted a problem filing timely discovery responses because the assigned paralegal was leaving on vacation. Whether the problem was caused by delays by Katz in forwarding the documents to Pennsylvania, or by the paralegal that had not advised Katz of the upcoming vacation, was not entirely clear.

It is clear that Katz's workload steadily increased over her tenure with K & S. By September 27, 2004, she had 127 cases, with 45 in suit. Barely a week later, on October 2, 2004 she reported that she had 194 cases. By November 8, 2004, she had 203 cases, with approximately 100 in suit. As

of December 6, 2004, the number had grown to 239 cases, with 125 in suit. During the period from September 2004 through August 2005, Katz filed 461 suits in Maryland. She was assigned over 500 total matters.

Katz did not have an unusual caseload for a K & S attorney, when evaluated based solely on the number of cases. More senior attorneys have up to 1,000 or more cases assigned to them. It also is not unusual at K & S to manage discovery with the assistance of paralegals in other offices.

Katz also noted the growth in her workload in other areas. While the practice of the firm is to move aggressively toward settlement, and to settle most cases early, Katz had a volume of cases in suit with active discovery. Unlike the practice in some other jurisdictions, Maryland did not require early arbitration, so cases did not get pushed as easily towards settlement. Therefore, in addition to discovery, Katz began to handle a steady array of motions and court appearances. In one e-mail in late April 2005 that discussed calendar matters that were scheduled in the next six weeks, Katz noted six motions hearings in a week period, together with multiple mediations. Additionally, she had matters in jurisdictions throughout the state.

Katz managed to meet various competing demands with one glaring omission. She failed to enter deadlines into Time Matters in forty-seven cases. These were all Nissan or Toyota cases that were aggressively litigated by the law firm of Piper Rudnick.[6] The discovery filed in those cases was relatively routine. However Katz did not access, or even attempt to access, paralegal assistance with responses in those cases.

Although Katz was assigned a specific paralegal in the Pennsylvania office to work with in her early months with the firm, that system evolved. By the fall of 2004, K & S paralegals were assigned to specific manufacturers, so dis-

---

6. Piper Rudnick is presently known as DLA Piper.

covery was referred by lawyers to the paralegals in charge of that manufacturer. Although there was a K & S paralegal to assist with Nissan and Toyota matters, Katz seemed unaware of that assignment. Since Katz sought no assistance in these cases, and discovery and motions were never logged into Time Matters, no alerts were generated when responses were delinquent.

When timely responses were not filed, a series of Motions for Sanctions seeking dismissal were filed. Katz did not respond to those Motions. Rather, she undertook to prepare discovery responses. In twenty-eight cases, the Motions for Sanctions were treated as Motions to Compel, and a deadline was set to file belated discovery responses. In eighteen of those matters, no discovery was ever filed. In the remaining ten, answers were filed outside the extended deadline. Renewed Motions for Sanctions were filed, and all but three of those were not even answered. The first case dismissal occurred in May 2005. Ultimately, dismissals with prejudice were entered in all forty-seven cases.

Katz was overwhelmed by January 2005. While she claimed to use her best judgment in juggling competing demands, that judgment was seriously flawed. Rather than prioritize the overdue discovery and motion responses, Katz continued to focus on putting cases in suit and pushing for settlements, as those were the objective criteria being measured within the firm. By that time, Katz was also out of the office a lot with court appearances and depositions. Katz demonstrated no appreciation of the risk she ran by ignoring the motions or overdue discovery. She seemed genuinely unaware that matters could or would be dismissed because of the discovery lapses.

Katz acknowledged that she was afraid to disclose her lapses to Kimmel and Silverman. Katz felt the partners were not pleased with her and that her job was on the line. While this assessment was not completely accurate, it impacted her decisions. Since the discovery and motions in the dismissed cases were never logged in to Time Matters, the problem could not be detected through the firm's com-

puterized system. However Katz also acted affirmatively to cover up her difficulties. In June and July 2005, Katz forwarded Kimmel copies of at least ten (10) letters she purportedly sent to opposing counsel in cases that she knew had already been dismissed.

The Iweala case was the first dismissed case that came to light. In Iweala, Katz was given an extension to file discovery in an Order entered in response to an initial Motion to Compel. Although Katz mailed responses within that extended deadline, they were unexecuted. In response to a renewed Motion to Compel, which also went unanswered, the Iweala matter was dismissed with prejudice on May 24, 2005.

On June 29,2005, the Iweala dismissal came to the attention of K & S, and the Office Manager immediately communicated with Katz seeking an explanation. Katz characterized the dismissal as inappropriate, as she claimed to have timely filed discovery. Katz also represented that a Motion to Reopen had been filed. That Motion was not actually docketed until July 6, 2005.

Silverman contacted Katz when he learned of the problem, and was initially assured that she believed the matter could be reinstated. When Katz later acknowledged that she had made a mistake and the case could not be reinstated, Silverman did not take any further action. Silverman was unaware of any other problems at that time, and felt Katz was generally doing a good job. He believed that Iweala was an isolated mistake, that good lawyers occasionally make mistakes, and that they should move forward.

In mid-July, other concerns regarding discovery came to light at K & S. The Office Manager e-mailed Katz on July 19, 2005, asking why they had received Orders ruling on Motions to Compel. Again, Katz downplayed the extent of her difficulties, claiming that discovery had already been sent in some and the rest would be done that day. As she claimed, "Nissan loves to file these things, even though the discovery deadline is months away. The reason the rogs aren't getting in is because I've been so limited in time in

following up with the clients. These are all files that are here, so I didn't have Tracey working helping me with them." No partner response to these concerns occurred.

Katz was scheduled for a one-week vacation in late July. She returned to two bins of mail and other matters that had piled up in her absence. By that point she was totally overwhelmed. She described herself as depressed, crying all the time, and she had lost twenty pounds. Although the firm finally hired a paralegal for the Maryland office during July, Katz had the added responsibility to train the person. Katz submitted her resignation by e-mail on August 10, 2005, and left immediately. While the firm asked her to stay for a period to help with transition, she refused, citing health concerns.

Silverman drove to the Maryland office and met with Katz on the day she resigned. This was his first visit to the Maryland office. He described Katz as looking "like a beaten dog." He was immediately concerned by stacks of documents in her office that were not filed. When he looked in file cabinets, he found other loose papers. K & S mobilized attorneys and paralegals to assist in assessing the problem. The firm immediately hired three Maryland lawyers, and Katz's cases were all reassigned within a two to four week period.

K & S undertook to resolve client problems that came to light that were created by Katz's inaction. Clients were contacted and advised of the status and outcomes in their cases. Silverman quickly made fair settlement offers, including payment of fees to consult with counsel, for former clients who asserted claims.

Charles Carter was one client whose case was dismissed as a result of inaction by Katz, who failed to designate experts in a timely manner. Carter attempted to contact the K & S Maryland office six times in late July and early August to check on the status of his case and to obtain a scheduling order. He was unaware of Katz's resignation until some later point in time when he received a voice mail message. Carter also sent letters to K & S's home office on

August 23, September 10, September 28 and December 31, 2005 and February 6, 2006 seeking a status update and Scheduling Order. Carter also sent e-mails to the home office. The first responsive communication Carter received was a letter dated February 7, 2006, advising him of the dismissal of his case.

Carter's case was eventually resolved to his satisfaction, including payment of his damages and fees to enable him to consult with counsel. Silverman negotiated the settlement reasonably and efficiently. However Silverman did not become involved until Carter hired counsel after learning of the dismissal.

During Katz's tenure with K & S, she was the only attorney barred in Maryland. Lawyers and paralegals within the firm were available to assist her, but her communications with them were exclusively by e-mail and telephone. Rapkin did visit the Maryland office on three or four occasions, mostly with the office manager when she interviewed potential paralegal candidates. Neither Graham nor Rapkin noted anything unusual in those visits. Neither Kimmel nor Silverman visited the Maryland office prior to Katz's resignation. They were unaware of concerns with Katz's representation. Kimmel noted he received no client complaints, which is the more typical sign of overload. Kimmel also emphasized that resources were always available to assist, if Katz had only asked.

Kimmel and Silverman were aware of Katz's request for staff support. However, they felt Katz appeared to be doing an adequate job and they were unaware of the growing problems. Although they claimed her numbers didn't dictate the staffing response, it seems clear they were not pushing to address Katz's staffing request. When the crisis hit in August, they were able to hire three lawyers almost immediately. Maryland remains staffed now with two lawyers and one paralegal with attorney caseloads around 200, which are significantly lower than other K & S offices.

Based on these factual findings, the hearing judge concluded that Respondents violated MRPC 5.1. In reaching this conclusion, she considered the only two Maryland cases directly addressing MRPC 5.1, *Attorney Grievance Commission v. Ficker*, 349 Md. 13, 706 A.2d 1045 (1998), and *Attorney Grievance Commission v. Mooney*, 359 Md. 56, 753 A.2d 17 (2000), and two cases from other jurisdictions dealing with rules violations involving supervision of other lawyers, *In the Matter of James L. Farmer*, 263 Kan. 531, 950 P.2d 713 (1997), and *Davis & Goldberg v. Alabama State Bar*, 676 So.2d 306 (Ala.1996).

Judge Cox determined that the degree of supervision K & S's founding partners provided Katz, directly or through Rapkin, did not account adequately for their threshold knowledge that Katz lacked experience in the field of automotive warranty and "lemon law" claims generally or handling contested cases in Maryland's circuit courts (where most of the cases would be initiated). Additionally, the Pennsylvania attorneys did not ascertain whether distinguishing elements of warranty and "lemon" law in Maryland, versus Pennsylvania, necessitated an adjustment to the firm's standard policies and procedures for handling its "bread-and-butter" cases. Moreover, the hearing judge concluded that the supervision given was insufficient because it substituted a computerized case management system for hands-on, on-site review of how cases assigned to Katz were being handled. The procedures for identifying pending deadlines lacked adequate safeguards against an attorney avoiding altogether use of the computerized system. Finally, the supervising attorneys failed to mentor the employee, new to their firm, in how to fulfill the ethical duties owed each client in the context of a high-volume practice emphasizing fee-generation as the primary measure of attorney success. Respondents also were found to have violated MRPC Rule 1.4 because the firm failed to respond in a timely fashion to Carter's direct inquiries to the Ambler office regarding the status of his Maryland case. Mitigating these breaches, according to the hearing judge, was the effec-

tive response of the firm when the partners learned of the professional and ethical failings in the Maryland office.

## III. Exceptions

Petitioner filed no exceptions to Judge Cox's findings and conclusions. Respondents filed specific exceptions to four of her findings of fact. Furthermore, they asserted that, on de novo review, this Court should set aside all of the hearing judge's recommended conclusions of law and dismiss the charges.

First, Respondents take exception to the hearing judge's finding that "Katz was responsible for all of her own clerical work." Second, they dispute the finding that "Kimmel directed Katz to send at least ten substantive demand letters three days per week to opposing counsel, and that unless Kimmel agreed in advance, this was 'to be done without fail as instructed.'" Third, they contend that the evidence is not clear and convincing that "[a]lthough there was a K & S paralegal to assist with Nissan and Toyota matters, Katz seemed unaware of that assignment." Finally, Respondents take exception to the finding that "[K & S's] Maryland [office] remains staffed now with two lawyers and one paralegal with attorney caseloads around 200, which are significantly lower than other K & S offices." Although Respondents concede that this latter finding is "facially accurate," they resist an inverse inference drawn from the finding that Katz's assigned caseload was excessive during her employment.

As to Judge Cox's proposed Conclusions of Law, Respondents argue that because MRPC 5.1 requires only a "reasonable effort" at supervision and does not require a supervising attorney to act as "guarantor" of an employee's ethical behavior, the Conclusions of Law with regard to MRPC 5.1 should be overruled. As to the charge of violating MRPC 1.4, Respondents contend that the duty to communicate with a client is personal to the specific attorney handling the client's matter and a breach of that duty may not be visited upon them vicariously.

### IV. Standard of Review

The hearing court's findings of fact are "prima facie correct and will not be disturbed unless clearly erroneous." *Attorney Grievance Comm'n v. Brisbon*, 385 Md. 667, 674, 870 A.2d 586, 590 (2005). Deference is accorded the hearing judge's findings because, having seen first-hand the demeanor of the witnesses, the hearing judge is in the best position to assess their credibility. *Attorney Grievance Comm'n v. Stolarz*, 379 Md. 387, 398, 842 A.2d 42, 48 (2004). Maryland Rule 16–759(b)(2)(B) requires that Bar Counsel meet its burden of "proving the averments . . . by clear and convincing evidence," pursuant to Maryland Rule 16–757(b). *Attorney Grievance Comm'n v. Guida*, 391 Md. 33, 50–51, 891 A.2d 1085, 1095 (2006). In a disciplinary proceeding, however, evidence offered in the charged attorney's defense or in mitigation of sanctions need only be shown by a preponderance of the evidence. *Attorney Grievance Comm'n v. Garfield*, 369 Md. 85, 98, 797 A.2d 757, 765 (2002). The proposed conclusions of law made by the hearing judge, such as whether the Maryland Rules of Professional Conduct were violated, are considered de novo by this Court. Md. Rule 16–759(b)(1); *Attorney Grievance Comm'n of Maryland v. Kreamer*, 404 Md. 282, 292, 946 A.2d 500, 506 (2008).

### V. Analysis

We first consider Respondents' exception to the finding that Katz performed "all her own clerical work." Respondents contend that the evidence in the record is insufficient to support a statement regarding Katz's clerical responsibilities over the entire course of her tenure with the firm. They point instead to evidence showing that Katz had the support of paralegals located in the Ambler, Pennsylvania, office. We overrule this exception.

The threshold of clear and convincing evidence does not demand "unanswerable" evidence. *Mooney*, 359 Md. at 79, 753 A.2d at 29. Although paralegals located in Pennsylvania were available to help process case filings, the undisputed

evidence was that, for all but two weeks of Katz's tenure in the Owings Mills office, no other employee worked in that office. To obtain the assistance of the Pennsylvania paralegals, Katz was required to photocopy, package, and forward the relevant documents to them. Moreover, Katz was not only accountable for her responsibilities as an attorney, but also for the quotidian tasks that ordinarily would belong to support staff. The record indicates that solely she was responsible for opening and sorting all mail, prioritizing all phone messages, and making all photocopies. Katz even was required to record and report how many pieces of paper she used each month. Although the term "clerical work" fairly may include some of the professional tasks that Katz could have assigned to the Pennsylvania paralegals, the available support of the legal specialists did not embrace the day-to-day clerical duties necessary to the basic functioning of the Maryland office, all of which were performed by Katz. *See Attorney Grievance v. Zuckerman*, 386 Md. 341, 350, 872 A.2d 693, 698 (2005) (noting that the employee answered the telephone and performed "other clerical duties" before she became the office paralegal). The hearing judge's finding that Katz performed all her "own" clerical work is a fair and reasonable characterization of certain of Katz's duties as the sole employee resident in the Maryland office.

The second exception noted is to the hearing judge's finding that "Kimmel directed Katz to send at least ten substantive demand letters three days per week to opposing counsel, and that unless Kimmel agreed in advance, this was 'to be done without fail as instructed.'" This exception also is overruled.

Respondents argue that because a standard format demand letter was provided to and used by Katz, each letter required only a "modicum of effort and time" and therefore was not a "substantial" task. Substantive is not always a synonym for substantial. "Substantive" is defined as "being a totally independent entity; real, rather than apparent; firm, permanent, enduring; essential." WEBSTER'S NINTH NEW COLLEGIATE DIC-

TIONARY 1176 (1989). In the special context of the law, an additional sense of "substantive" is defined as "creating and defining rights and duties." *Id.* Therefore, the letters Katz was required to produce were substantive if each was an independent, permanent, and enduring record, or if the contents were calculated to marshal and advocate essential facts related to the rights and duties of the firm's clients.

Obviously, the demand letters were created to form a permanent and enduring record. More significantly, the record reveals that Kimmel explicitly condemned Katz for her failure to go beyond form letters ("I do not want form letters or correspondence that clearly shows the file has not been reviewed. Each letter should have substantial detail and/or a demand that applies accurately to that particular case."). Kimmel commented on Katz's record of settling almost every case for $2500: "No two cases are identical and so I expect that settlement of fees would . . . not be identical as they have been." Kimmel apparently viewed each case as "a totally independent entity." He expected that each letter would reflect that individuality through 1) diverse amounts recovered in attorney's fees and 2) language evidencing the particulars of each situation. In other words, he directed her to make each letter "essential" and "real, rather than apparent." Each letter was related to the asserted rights of the respective clients. Clearly, Respondents' present argument to the contrary notwithstanding, Kimmel established a benchmark of ten substantive letters.

Regarding the notion that the individualization of the form letter required only a "modicum" of effort in each case, Kimmel suggested in an email that Katz spend between 30 and 60 minutes working with each file, as was his practice with his caseload. Like the definition of "substantive," the primary senses of the meanings of "substantial" relate to a thing's essential content; however, the third sense definition of "substantial" is "considerable in amount or numbers." *Id.* Kimmel required Katz to submit to him copies of 30 demand letters each week. Each may have taken only a "modicum of time" to generate physically, but Kimmel encouraged Katz to

emulate his own professional habit and spend 30 to 60 minutes to "update" herself on each case file. Assuming that Kimmel's billing habits are not excessive, Katz's emulation of him would require updating herself on at least the 30 cases targeted for each week's demand letters, constituting between 15 and 30 hours per week of her time—a "considerable amount" of billable time. The record is clear and convincing that Kimmel expected substantive letters in a substantial number of cases.

■ Respondents take exception to the hearing judge's finding that Katz seemed unaware of the availability of one or more Pennsylvania-based paralegals to assist with cases directed to the vehicle manufacturers Nissan and Toyota. It was stipulated that Katz "knew she had paralegal assistance for responding to interrogatories and document requests and that specific paralegals dealt with specific manufacturers." Respondents cite the following testimonial excerpt, claiming that it indicates that the evidence presented of Katz's awareness of the availability of the assigned paralegal for claims against Nissan was not "distinctly remembered and the details thereof narrated exactly and in due order."

"I don't remember [whether I was given a Nissan or Toyota paralegal]. I remember there was a different one for General Motors, one for Ford, one for Chrysler. Rest of them I don't remember. I think they were batched. I may have had one for Nissan at the time and maybe someone else. I don't remember exactly. I remember the three big ones I had a separate paralegal for each one." Later in her testimony, when Katz was asked whether Tracey Christy would have been the Nissan paralegal, Katz testified that she remembered Tracey and that "Tracey could have been the Nissan paralegal."

This Court relies on the impressions of the hearing judge in matters of witness credibility. *Stolarz,* 379 Md. at 398, 842 A.2d at 47. It is appropriate for the hearing judge to "pick and choose which evidence to rely upon from a conflicting array when determining findings of fact." *Guida,* 391 Md. at 50–51, 891 A.2d at 1096. Judge Cox's finding is that Katz

seemed unaware of a designated paralegal for Nissan claims. Katz distinctly remembered at least three other paralegals assigned for three other motor companies. Yet, her testimony is that she could only "guess" that Tracey Christy "could have been" the Nissan-specific paralegal. In this case, Katz's inability to remember clearly is the tipping point of Judge Cox's finding that Katz "seemed" unaware of a specific Nissan-centric paralegal. Katz's inability to recall the paralegal with clarity is evidence that, at least in comparison to her clear awareness of other manufacturer-specific paralegals, she "seemed" unaware of the specific assignment of a paralegal to aid in handling claims against Nissan. We overrule the exception.

Respondents assert that it is clear error for the hearing judge to have found that "[K & S's] Maryland [office] remains staffed with two lawyers and one paralegal, with attorney case loads around 200, which are significantly lower than other K & S offices," even though the statement is "facially correct." Respondents take exception not because the statement is unsupported, but because this accurate and supported finding of fact may suggest, in comparison, that Katz's caseload was excessive during her employment. Respondents explain the "seemingly reduced case load in Maryland" post-Katz as "due to the unusually high number of appeals ... pursued [in this jurisdiction] based on certain rulings of federal and state trial judges."

During Katz's tenure with K & S, cases were filed and processed in Maryland essentially under the same rules of law and procedure as such cases presently are filed and processed. If, in 2008, the appellate process in Maryland requires additional attorneys and staff, then perhaps Katz's workload was not analyzed carefully, assigned prudently, or managed professionally in 2005. In fact, the hearing judge alluded to this very explanation when she noted the reduced workload in the current Maryland office. "Differences between Maryland practice and the firm's experience in other states impacted proper supervision in this case." In any case, the pertinent findings are conceded as accurate. We require no further

persuasion to overrule the exception. *See Attorney Grievance Comm'n of Maryland v. Granger*, 374 Md. 438, 453, 823 A.2d 611, 620 (2003) (overruling an exception to a hearing judge's accurate statement).

We now turn to Respondents's contentions that the conclusions of law by the hearing judge should be set aside. We decline to do so. Rather, we adopt her conclusions and resolve that Respondents violated MRPC 5.1 and 1.4.

## A. MRPC 5.1

As basic components of a "reasonable effort to have in place measures giving reasonable assurance that all lawyers in the firm conform to the Maryland Rules of Professional Conduct," partners must establish policies and procedures that, *inter alia*, are "designed to ... identify dates by which actions must be taken in pending matters ... and ensure that inexperienced lawyers are properly supervised."[7] MRPC 5.1(a); MRPC 5.1, Comment 2. Other measures may be necessary to fulfill supervisory obligations, depending on the structure and nature of the law practice. MRPC 5.1, Comment 2. Informal supervision and periodic review ordinarily suffice when the firm is small and the attorneys experienced, but other or different circumstances may indicate the need for "more elaborate" supervisory measures. MRPC Rule 5.1, Comment 3. Partners should be responsible for the "ethical atmosphere of [the] firm" and its influence on the conduct of all its members. *See* MRPC 5.1, Comment 2. Partners should not assume that all lawyers associated with the firm inevitably will conform to the Rules. *Id.*

 Our Rules require that a firm's executive lawyers design and implement supervisory procedures that anticipate the ethical demands specific to the practice they lead. Proper design of a firm's internal policies and procedures is accom-

---

7. The other basic components of what may constitute a reasonable effort, illustrated in MRPC 5.1, Comment 2, are the supervisor's responsibility to "detect and resolve conflicts of interest" and to "account for client funds and property."

plished when the partners and managers in the firm are responsive to circumstances that indicate a heightened need for "more elaborate" supervision. *Id.* To meet this obligation, the Rules contemplate that partners and managing attorneys must adapt the level of supervision to a given attorney's experience and relative to the assigned tasks and the firm's nature and culture.

In the present case, numerous warning or alert indicators should have informed the partners and managing attorneys of K & S of the need for more heightened supervision than was given Katz. First, the out-of-state law firm determined to establish a beachhead office in Maryland. Much was at stake, including the firm's professional reputation and the well-being of the Maryland citizens they already had agreed to represent. The executive attorneys at K & S had a responsibility to establish and maintain the new office on solid principles of professional conduct. Among the foundational responsibilities when opening and operating a branch office in a new and unfamiliar jurisdiction is to address adequately practice distinctions between the existing office and the beachhead location. In this case, neither the founding partners nor the Maryland attorney they hired to manage the Maryland office ever had filed a case in a Maryland circuit court before the Owings Mills office opened its doors.

In the opening forays into its emerging Maryland practice, K & S filed cases in the venue closest to the Owings Mills office, as was done with regard to its Pennsylvania office for Pennsylvania cases, unaware that in Maryland ordinarily a case must be filed either in the county where the motor vehicle was purchased or where the purchaser resides. *Ficker,* 349 Md. at 18–19, 706 A.2d at 1047 (concluding that the difficulties of handling a high-volume caseload were worsened by the need to be in multiple jurisdictions across the State). Several distinctions between Maryland and Pennsylvania practices profoundly influence the handling of automotive warranty claims. Basic familiarity with Maryland law and practice would have highlighted differences in fee-shifting and early

settlement provisions. An understanding of Maryland procedure would have highlighted differences in venue, choice of forum based on dollar amount of the claim, challenges to expert witnesses, and the desirability of perhaps establishing relationships with credible Maryland experts. To protect prospective Maryland clients from the harm of incompetent representation, these differences should have been researched, appreciated, and resolved during the design of supervisory procedures for the new office, not in the midst of ongoing litigation. K & S might have adopted any number of strategies to overcome its lack of experience in Maryland practice, such as processing a few "test" cases before increasing dramatically the Maryland workload or hiring seasoned attorneys to be of counsel.

Respondents postulated at oral argument that an asserted lack of problems encountered by K & S in opening branch offices in other states was evidence that relying on the same procedures for establishing the Maryland practice was not flawed. The record, however, is silent regarding evidence supporting that premise. No evidence was before the hearing judge (and therefore is not before this Court) as to whether the beachhead offices in other jurisdictions experienced similar practical challenges (or encountered no problems) such as those faced in Maryland. Neither does the record reflect the qualifications of the K & S attorneys engaged or dispatched to represent the firm's clients in its initial forays into other jurisdictions, an essential premise in any fair comparison to the present case.

Next, a relatively low level of experience of an attorney should indicate that more elaborate supervision is in order. According to Comment 3 to MRPC 5.1, a small firm of experienced lawyers falls at a place on the supervisory intensity spectrum where informal supervision and periodic review ordinarily are sufficient. The facts of this case, however, stand in stark contrast to the example in the Comment. In contrast to the setting of a "small firm," we have in this case a firm with offices in five states and where the firm's experienced attorneys carry caseloads of 1,000 clients or more. In

this business model and practice setting, a relatively inexperienced attorney was stationed alone in an office physically remote from the critical mass of the firm and directed to begin filing numerous cases as rapidly as possible. Katz had no experience in the practice of automobile warranty or "lemon" law. She also was a novice in other critical areas, such as circuit court pleadings and practice, jury trials, and contested litigation generally. Supervisory procedures should have been designed deliberately to address the attorney's inexperience and to counterbalance her physical distance from the ready availability of steadying interaction with peers and managers.

In Maryland, supervising attorneys are obligated to determine whether the employee's skill level is commensurate with the responsibilities assigned. *Ficker*, 349 Md. at 28, 706 A.2d at 1052. This Court held in *Ficker* that if a partner expected a newly hired attorney to "jump immediately" into a particular field of practice, the supervisor was obliged to determine whether the supervised attorney was trained sufficiently or experienced enough to provide competent representation in that area. *Id.* "[The supervising attorney] had no right merely to assume such competence." *Id.*

The supervised attorney in *Ficker* "was an admitted novice in this area of law, which, according to Ficker, constituted 98% of his practice." *Id.* Likewise, Katz was an admitted novice in the field of automotive warranty and "lemon" law, which constituted virtually the entirety of the K & S practice. Like the employer in *Ficker*, Respondents were obligated to determine if Katz, in fact, was trained and experienced sufficiently to act as the managing attorney of K & S's Maryland office. They had no basis to assume such competence.

Respondents intended for Katz to "jump immediately" into litigating and settling "lemon law" cases. K & S already was accepting Maryland cases during Katz's orientation period. The day she left the month-long orientation in Pennsylvania, Katz had over 50 cases to file in Maryland. After only the one-month orientation, the partners authorized her to set up and manage the branch office in Maryland, where she received

virtually no hands-on supervision. A one-month orientation, it appears with the benefit of hindsight, does not necessarily establish as a fact that her training and experience were sufficient to provide competent representation of the firm's Maryland clients.

Respondents acknowledge that supervision of a Maryland attorney requires a determination of competency. They assert in their memorandum to this Court that a "fair reading of *Ficker* supports the proposition that, if a supervising attorney ... gives, and is available to give, instruction to associates *determined to be capable of providing competent representation,* the supervising attorney is acting reasonably." (Emphasis added.) The hiring attorney failed to discover that Katz had no experience in contested litigation and that she lacked an understanding of the possibility of sanctions or dismissal for failure to respond to motions to compel discovery. Respondents failed to determine if Katz, in fact, was competent to perform the responsibilities they assigned to her. Moreover, in the areas where K & S did determine the limits of Katz's expertise, Respondents made no attempt to design the supervision to overcome her weaknesses.

Next, a higher level of supervision may be indicated when an employee is new to the firm, at least until the employee's reliability is demonstrated. *Zuckerman,* 386 Md. at 350, 872 A.2d at 699. In *Zuckerman,* the respondent conducted a high-volume practice in relatively small-dollar personal injury cases in Baltimore City for twenty-two years. *Zuckerman,* 386 Md. at 349–52, 872 A.2d at 698–700. Within two or three days of hiring a paralegal, he delegated to her the authority to write checks on his trust account so that he could "concentrate on trying cases." *Id.* The employee was the niece of his previous office manager, who had retired. *Id.* Previously, the young woman worked for Zuckerman for about six months, performing clerical duties and answering the phone. *Id.* Upon being given control of the checkbook, she devised a scheme to steal money from the trust account. *Id.* This Court found that the act of "giving a new employee with

no history of reliability" responsibility for the checkbook without oversight was "a failure to make reasonable efforts" to ensure employee compliance with the lawyer's professional obligations. *Id.*

Respondents had less history with Katz than Zuckerman had with the paralegal he hired. Zuckerman failed to supervise properly a new employee when he entrusted her with the ability to write checks after only a few days at the new job. *Id.* Likewise, K & S failed to supervise Katz adequately. Respondents entrusted a new employee with the full burden of the Maryland practice, but did not design supervisory strategies to account for the firm's institutional unfamiliarity with her reliability, including her work habits, health, or character. Although K & S contacted at least one of the references Katz provided, it hired Katz on the day of her sole interview. It is not reasonable supervision to assume that all of an employee's relevant character and work traits are revealed in the initial interview or will be disclosed fully by individuals selected by the prospective employee as references.

Furthermore, when Katz's performance was evaluated during her tenure at K & S, her supervisor did not come to the Maryland office. Instead, Katz selected case files and brought them to Pennsylvania for review. Lawyers with direct supervisory responsibility must make efforts to ensure that attorneys under their stewardship are complying actually with their ethical and professional obligations. MRPC 5.1(b). The "artist's-portfolio" or "writing sample" approach to case review invites employees to put only their best work before the supervisor. Properly designed procedures for supervising new employees should include mechanisms for review that are not dependent solely on employee self-disclosure.

Physical isolation of an attorney from peers and supervisors also indicates a heightened need to adapt supervisory strategies to ensure compliance with the Rules, even in an internet-oriented society. In this case, Respondents essentially relied on an isolated, inexperienced attorney to supervise herself. Katz was told by Kimmel, "I want YOU to head up MD and

make it a well-oiled machine. . . ." *See Ficker,* 399 Md. at 450, 924 A.2d at 1108–09 (sanctioning attorney for "failing to have in place a system whereby cases were immediately assigned to a particular attorney within his office when the cases first came in, and instead, allowing particular attorneys to assign themselves," which practice "fostered an environment where rules . . . were almost inherently violated"). Instead, the supervising attorney must "inform himself [or herself] of the status of his employees' efforts" and follow up to ascertain whether delegated tasks are being accomplished. *Mooney,* 359 Md. at 90, 753 A.2d at 35; *Zuckerman,* 386 Md. at 352, 872 A.2d at 700 (sanctioning an attorney for supervisory shortfalls for failure to follow-up on delegated task, as well as entrusting high-level responsibility to a new employee). Katz's supervisors did not inform themselves through periodic audits or on-site visits. Her supervisors depended, to a great degree, on her self-disclosures to determine if delegated tasks were completed.

Requests for help, however generalized, especially from a physically remote staff attorney, warrant investigation to determine whether the employee's perception that her failures are attributable to objective factors is accurate or whether increased supervision, support, and guidance might avert or reform performance shortfalls. The record shows that Katz repeatedly brought to her supervisor's attention her desire for on-site staff support in the Maryland office. Her requests did not foster an investigation by her supervisors to see if client obligations in Maryland were going unfulfilled. Instead, the response was to encourage her to adhere to the existing procedures, and ironically, to create more work. Her complaints that the workload in Maryland already was overwhelming resulted in verbal and written reminders of her quotas.

Respondents point out that other attorneys within the firm, even those with larger caseloads, handled discovery adequately by adhering to the firm's established procedures. The fact that other lawyers might have handled Katz's workload more efficiently is not persuasive. The Comments to MRPC Rule 5.1 clearly contemplate the need to individuate supervision

based on "the nature of the practice" and the experience of the attorney. *See generally Davis*, 676 So.2d at 307 (imposing unmanageable case loads and creating a corporate culture focusing on new rather than existing clients results in sanction against supervising attorney). Katz opened 461 new cases over the course of her 13-month employment at K & S. She actively managed 15 to 20 cases per week. All toll, she was responsible for over 500 matters. Her weekly benchmarks were to generate $10,000 in settlements and file at least fifteen complaints. She was scheduled to appear in a number of different courts, slated to appear at a number of settlement negotiations, and expected to run the office. Unsurprisingly to us, she announced to her direct supervisor that she needed help.

"Help" came in the form of communications intended to motivate her to work harder. Presumably, those missives and exhortations were consistent with K & S's standard practices. No one came to the Maryland office to help catch up on filing or to check on the situation until significant lapses occurred and major damage control efforts were required. "To help with the backlog," her supervisor demanded that she create at least 30 demand letters each week and forward the letters for his personal review. After directing Katz to write 30 demand letters each week, Kimmel promised, "While you may disagree with this routine, watch what happens as a result. You will blow through your numbers, be better prepared for arbitrations and be in more frequent contact with clients. As a consequence, we can add another attorney and at least one paralegal." Katz was promised local support prospectively, but only if she generated more work. Her assessment that she needed help *now* was not given adequate analysis or credence by her direct or ultimate supervisors.

Finally, in some cases, a law firm's culture inherently engenders a need for specific supervision regarding how to balance the lawyer's obligations to clients within the business model of the firm. This was the case at K & S. The firm culture at K & S strongly emphasized the number of filings, case turnaround, and revenue generated as the significant

measures of associate success; not rare criteria, in and of themselves, but which, in an admittedly high-volume business model, carry added responsibilities for the supervision of associates. Comment 2 to MRPC 5.1 urges partners to be accountable for the impact of corporate culture on employee decision-making. Employees new to such a culture require assistance from supervisors in ensuring that ethics and professionalism are not lost in the focus on income and profit goals. Respondents failed to supervise with the appropriate balance in mind. Katz's first supervisor wrote in an email to her, which he copied to Silverman, Kimmel, and the office manager, "[F]irst and foremost, you must make your number.... Therefore, no excuses, don't call, no need to talk, just get on it and only call me with good positive news of settlements, or demands you are going to make." Respondents provided no guidance in balancing ethical considerations with the pressure to file and settle cases to generate specific revenue benchmarks.

Thus, numerous indicators alerted Respondents to the need for a heightened level of supervision, but Respondents failed to design and implement policies and procedures that reasonably would ensure compliance with the Maryland Rules under the specific circumstances of this case. In addition, Respondents neglected other basic components of a reasonable supervision effort required under our view of MRPC 5.1. Foremost among these failures was failing to supervise the identification of pending deadlines. See MRPC 5.1, Comment 2. K & S had in place an adequate system for tracking deadlines once the deadline was identified; however, the procedure for initially identifying and entering the deadline into the system was defeated too easily by the sole employee in the physically remote office. Many incoming pleadings, motions, and inquiries were mailed directly to the Maryland office, where Katz was responsible for opening and sorting the notices and entering the relevant data into the computer system. She had singular power to override the firm's deadline identification system simply by ignoring it.

*Ficker* indicates that the nature of some firms requires an automated file tracking system to manage deadlines, but it does not follow that the mere acquisition and the placing in service of a computerized system constitutes full satisfaction with appropriate supervision obligations. Obviously, if the computer system had been used faithfully by Katz, it would have alerted her, and the out-of-state home office as well, that deadlines were slipping in Maryland. The supervising attorney may not assume that the associate attorney necessarily is complying with office procedures. Partners and owners must put in place some failsafe to ensure that the employed attorneys are not avoiding the computer system, especially where the computer system is the sole wellspring of accountability. Even in response to Kimmel's supervisory tactic of requiring Katz to prove that she was producing the requisite quantity and quality of demand letters, Katz was able to fabricate demand letters in cases that had been dismissed. Kimmel's and the firm's procedures provided no cross-check against demand letters written for cases that went unidentified in the computer system.

Related to Respondents' failure to provide a system for identifying deadlines that could not be circumvented so easily is the responsibility supervisors have under our Rules to ascertain whether delegated tasks are performed actually. *Zuckerman,* 386 Md. at 352, 872 A.2d at 700; *Mooney,* 359 Md. at 90, 753 A.2d at 35 (holding that the supervising attorney fell short when he did not ascertain if an employee performed responsibilities in a competent manner). In *Zuckerman,* we sanctioned a Maryland attorney for improper supervision when he assigned a non-lawyer employee[8] to bal-

---

**8.** MRPC 5.3(a) provides that "a partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer." MRPC 5.3(b) provides that "a lawyer having direct supervisory authority over the non-lawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer." Like MRPC 5.1, the Rule governing the supervision of a non-lawyer employee obligates the partners of a firm and the non-lawyer's direct supervisor to employ

ance the firm's checkbook, but did not follow up to see that the delegated task was performed in fact. As a result of his failure to follow up on the delegated task, the attorney did not discover for an additional month that money was embezzled from his client trust account.

In the present case, Respondents delegated the entry of pending deadlines to Katz, but did not ascertain whether the task was performed actually and competently. The actual performance of the task could be procrastinated indefinitely or withheld deliberately, at least by an employee in a one-person office with the degree of freedom from comprehensive oversight ceded to Katz.

 Respondents assert that "no reasonable supervision could have avoided the conduct." Yet, Kimmel testified that the moment he set foot in Katz's office for the first time, over one year after she was hired, he knew that something severely was amiss. He observed that paperwork was piled in her office and that Katz looked "like a beaten dog." If, before then, Kimmel had supervised more closely the opening of the new branch in Maryland, he likely would have discovered the problems much sooner. Whether an employee's ethical breaches are due to the employee's sub-standard performance or the deliberate circumvention of standard procedures, proper supervision must include mechanisms to determine whether the delegated tasks are being performed.[9]

Respondents stress that help was available to Katz, "if she had been honest about the status of the cases." Comment 3 to MRPC Rule 5.1, however, counsels explicitly that "[T]he part-

---

"reasonable efforts to ensure the person's conduct" meets the standard of the lawyer's professional responsibility. Because under MRPC 5.1 both the supervising attorney and the supervised attorney have sworn an oath to abide by the same written code of professional conduct, the Rule directs attention to the code itself. The Rule governing the conduct of non-lawyer employees also points to the written code, but does so by holding both the lawyer and the non-lawyer to the lawyer's professional obligations.

9. It seems apropos here to recall the simple admonition attributed to former President Ronald W. Reagan, "Trust, but verify."

ners may not assume that all lawyers associated with the firm will inevitably conform to the Rules." Respondents were not free to assume that the associate inevitably would disclose her mishandled cases or conform with procedures for entering deadlines into the firm's computerized case management system.

## B. MRPC 1.4

■ Finally, we consider the charged violation of MRPC 1.4. Respondents assertedly were obligated to communicate directly with Carter, a Maryland client who contacted the Pennsylvania office, after Katz's departure, with questions regarding the status of his Maryland case. Respondents argue that this charge should be dismissed because the requirement of communication applies to the individual attorney handling the client's matter and therefore is "not a responsibility for which they can be vicariously responsible in a grievance proceeding." They point out that neither of them was counsel of record for Carter. Respondents further contend that because neither is licensed to practice in Maryland, it would have been an ethical breach for either to contact a Maryland client directly.

Carter hired K & S, not Katz. Carter's numerous post-Apocalyptic inquiries to the firm's home office placed a duty on the firm to respond in a timely fashion, especially where K & S had notice that the Maryland office had become dysfunctional and triage was required. The onus was on Respondents, when Katz resigned, to ensure that a response was made promptly to inquiries submitted to the firm by affected clients. To conclude otherwise would mean that a firm would have no responsibility to respond to its clients if a matter became unassigned, for any reason, to a specific attorney within the firm. In this case, Carter's initially assigned K & S attorney had left the firm. The purpose of the Rule would be thwarted if the firm Carter hired was not obligated to respond to his inquiries in such circumstances. Respondents, as the firm's managers, are accountable for this actionable delay.

## VI. Sanction

Under Maryland law, the purpose of disciplinary proceedings is

"not to punish the lawyer, but to protect the public and the public's confidence in the legal profession. We protect the public through sanctions against offending attorneys in two ways: through deterrence of "the type of conduct which will not be tolerated," and by removing those unfit to continue in the practice of law from the rolls of those authorized to practice in this State. The public is protected when sanctions are imposed that are commensurate with the nature and gravity of the violations . . . ."

*Attorney Grievance Comm'n of Maryland v. Siskind,* 401 Md. 41, 75, 930 A.2d 328, 347–48 (2007).

Respondents urge, at most, a reprimand for any failure to supervise in violation of MRPC 5.1 and dismissal of the charge of failed communication with a client in violation of MRPC 1.4. Bar Counsel recommends an indefinite suspension.

 Indefinite suspension was the sanction imposed in *Ficker* and *Mooney* where the respective attorneys violated MRPC 5.1 regarding proper supervision of junior lawyers.[10]

---

**10.** It can be slippery business, in trying to calibrate temporal limits for a suspension sanction, to extrapolate prior cases for comparability to the case at hand. For example, the dissenting opinion here seems to suggest that *Atty. Griev. Comm'n v. Hines,* 366 Md. 277, 783 A.2d 656 (2001), and *Atty. Griev. Comm'n v. Ficker,* 349 Md. 13, 706 A.2d 1045 (1998), are more apt barometers for calculating the minimum time before Respondents here may apply for reinstatement than is *Atty. Griev. Comm'n v. Mooney,* 359 Md. 56, 753 A.2d 17 (2000). Dissent op. at 691–93, 955 A.2d at 295. That, however, is not necessarily a fair inference to draw.

It is apparent from the hearing judge's findings of fact and conclusions of law in the present case that Respondents were "tried" for allegedly violating MRPC 5.1(a) and (b) (see Part II, A., Page 14 of the hearing judge's findings and conclusions). The respondent in *Hines,* on the other hand, was found to have violated MRPC 5.1(c), which holds accountable a partner or supervising lawyer for ordering/ratifying misconduct or failing to take reasonable remedial action, actually knowing of the existence of a junior attorney's misconduct, at a time when the ill consequences could have been avoided. *Hines,* 366 Md. at 279–80, 783

In *Ficker*, the attorney-proprietor of the law practice had been warned previously to install administrative and supervisory processes in his office that would foster the client focus protected by the Rule. In the 1998 disciplinary action (of the multiple ones mounted against him over the years), he was suspended indefinitely, but allowed to apply for reinstatement after 120 days.[11] *Ficker*, 349 Md. at 44, 706 A.2d at 1060. The suspension imposed in *Mooney* also was indefinite. He was eligible to apply for reinstatement no sooner than 90 days after the effective date of the suspension. *Mooney*, 359 Md. at 90, 753 A.2d at 35.

In the present case, though the supervisory procedures in effect at K & S were not as loose or flawed as those in the other cases where attorneys were sanctioned for failed supervision, the harm suffered by the K & S clients was egregious and flowed from the shortcomings identified earlier in this

---

A.2d at 657. Hines also was found to have violated MRPC 1.7 (conflicts of interest) in his representation. *Id.*

In the *Ficker* case of greatest relevance here (Ficker has been a frequent flyer in disciplinary matters with at least three reported disciplinary cases—319 Md. 305, 572 A.2d 501 (1990); 349 Md. 13, 706 A.2d 1045 (1998); and 399 Md. 445, 924 A.2d 1105 (2007); and two private reprimands in 1998 and 2002, respectively), the respondent violated MRPC 5.1 with regard to two complainants, but there also were a host of other violations as well, including multiple violations of MRPC 1.1, 1.3, and 8.4(d), spread across eights complainants. *Ficker*, 349 Md. at 42–43, 706 A.2d at 1059. Thus, the indefinite suspension in *Ficker* with a right to reapply for reinstatement no sooner than 120 days after the effective date of suspension is difficult to lay at the feet of the two 5.1 violations alone.

To be sure, *Mooney* also involved a host of violations (MRPC 1.1, 1.3, 1.4, 5.3, 7.1, 8.1, and 8.4), including a single count of violating MRPC 5.1 with regard to one complainant out of the four complainants whose matters were joined for disciplinary prosecution. *Mooney*, 359 Md. at 63–72, 753 A.2d at 20–25. Caution is the watchword when drawing conclusions that a former case supports a more apt time limitation than another case.

On balance, and compared to the facts of the present case (adjusting for the relative volumes and variety of Rules violated), *Mooney*, we think, is a better barometer here than *Hines* or *Ficker*.

11. In the fifth instance of disciplining Ficker for lax management of a high-volume practice, he was not allowed to seek reinstatement for one year. *Ficker*, 399 Md. 445, 924 A.2d 1105 (2007).

opinion. *See Attorney Grievance Comm'n v. Sapero*, 400 Md. 461, 490, 929 A.2d 483, 500 (2007) (holding a reprimand appropriate where violations were not egregious and clients not harmed). Indefinite suspension is in keeping with the sanction that would be imposed on a Maryland attorney who acted as Respondents acted. *Attorney Grievance Comm'n v. Dechowitz*, 358 Md. 184, 193, 747 A.2d 657, 661 (2000) (reasoning, in the context of imposing a Maryland sanction in a reciprocal disciplinary action, that the sanction will depend on the unique facts and circumstances of each case, but with a view toward consistent dispositions for similar misconduct) (citing *Attorney Grievance Comm'n v. Sabghir*, 350 Md. 67, 83, 710 A.2d 926, 934 (1998)).

Mitigating factors that may influence consideration of the appropriate sanction include a respondent's prior grievance history, the likelihood the misconduct will be repeated, and remorse. *Attorney Grievance Comm'n v. Seiden*, 373 Md. 409, 422, 818 A.2d 1108, 1115 (2003). In regard to mitigation here, the hearing judge noted the "unusual circumstances" and "extraordinary pressures" Respondents faced in the aftermath of Katz's abrupt resignation and their sudden realization of the scope of the problems she left behind. Judge Cox noted with approval the damage control efforts of Respondents. "They re-staffed the Maryland office, covered a busy court calender, sought client contact, prevented further lapses, and settled cases that could not be salvaged." In the end, only one client filed a complaint about failed communication: Carter. He, however, was fully satisfied with the settlement provided by Respondents.

Despite intense and effective damage control efforts undertaken immediately upon discovery of the employee's misconduct in *Zuckerman*, the attorney was suspended indefinitely. *Zuckerman*, 386 Md. at 349–52, 872 A.2d at 698–700 (noting that the attorney reported the loss immediately, cooperated with police, testified to aid in the conviction of the dishonest employee, and restored promptly the stolen funds). Moreover, we are not unmindful of the influence of our disposition here on any reciprocal discipline that may be imposed by

other jurisdictions. Md. Rule 16–773 (governing Maryland's reciprocal discipline for misconduct by Maryland attorneys in other jurisdictions); Md. Rule 16–760(c)(3) (requiring a Maryland respondent promptly to notify the disciplinary authority in each jurisdiction in which the respondent is admitted to practice of disciplinary action imposed by the Court of Appeals of Maryland). The sanction we impose generally guides other jurisdictions where Respondents are admitted to the practice of law in determining an appropriate disciplinary response. *See Dechowitz,* 358 Md. at 192, 747 A.2d at 661 ("[T]his Court is duty-bound to assess for itself the propriety of the sanction imposed by the other jurisdiction."). We conclude that indefinite suspension is the appropriate base sanction in this case.

■ Because of Respondents' intense, immediate, and largely effective recovery efforts,[12] however, we ultimately conclude that they may apply for reinstatement no sooner than 90 days. We are persuaded that Respondents understand where they erred and are unlikely to repeat history.[13]

---

**12.** The dissent states that this description mischaracterizes the hearing judge's findings and conclusions with regard to Respondents' recovery initiatives after learning fully of Katz's misconduct. Dissent, op. at 692–94, 955 A.2d at 296–97. We beg to differ.

The hearing judge found that

K & S mobilized attorneys and paralegals to assist in assessing the problem. The firm immediately hired three Maryland lawyers, and Katz's cases were all reassigned within a two to four week period.

K & S undertook to resolve client problems that came to light that were created by Katz's inaction. Clients were contacted and advised of the status and outcomes in their cases. Silverman quickly made fair settlement offers, including payment of fees to consult with counsel, for former clients who asserted the claims.

As to Carter, the only former Maryland client of K & S to complain to the Attorney Grievance Commission, the hearing judge found that, although K & S was slow to return his calls and other communications following Katz's resignation (hence the MRPC 1.4 violation), "Carter's case was eventually resolved to his satisfaction, including payment of his damages and fees to enable him to consult with counsel. Silverman negotiated the settlement reasonably and efficiently."

**13.** The dissent takes exception to this declaration. Dissent op. at 692–93, 955 A.2d at 296. The dissent grounds its view on the narrow basis that there are no "factual findings [presumably by the hearing judge] in support" of that declaration. We respond in two ways: (1) as noted

We are unaware of prior disciplinary actions against either Respondent. The purpose of protecting Maryland citizens

*infra* in the Majority opinion, it was found by Judge Cox that, once the situation in the Maryland office was revealed undeniably, K & S immediately took the supervisory and management action that was necessary to staff the Maryland office properly, re-assign Katz's cases, and contact the Maryland clients to apprise them of the true status of their cases and offer fair settlements (including paying fees for counsel) to clients who made claims; and, (2) at the time of the evidentiary hearing before Judge Cox, K & S maintained two lawyers and a paralegal in residence in its Maryland office. We submit that actions speak louder than words, as the adage goes.

Moreover, Respondents were cooperative throughout the investigation and evidentiary hearing of the cases. Judge Cox openly acknowledged this at the commencement of the hearing, after various stipulations by the parties were offered, when she remarked, "I think everyone's been incredibly cooperative so far."

Finally, although each member of the Court certainly is free to choose to believe or not a respondent's representation, Respondents, in the part of their Exceptions directed to possible sanctions, stated:

> Respondents, even before Petitioner instituted proceedings, and throughout these proceedings, have expressed deep regret over the harm caused to their clients' cases, and have demonstrated this remorse by making their former clients whole, at considerable expense.
>
> . . . .
>
> Respondents have taken even greater measures to ensure that the situation from which these proceedings arose never again occurs, and have an abiding and continuing interest in providing Maryland consumers able and ethical representation. Indeed, this situation has never occurred before, and will not occur again.

The dissent points, in support of its disbelief of Respondents' penitent state of mind and reformation, to K & S's website. Dissent, op. at 692, 955 A.2d at 296. According to the dissent's interpretation of that website, as it appeared on 29 July 2008, K & S maintains only two "managing attorneys" for the nine jurisdictions in which the firm maintains a practice. *Id.* That website, visited on 1 August 2008, contained no reliable basis for the conclusion reached by the dissent. The only portion of the K & S website that discusses the designation of "managing attorney" is the attorneys' biographies link. Of the sixteen attorney biographies on that link, the professional biographies of only two contain any reference to being a managing attorney, one specifically described as the "[m]anaging attorney for the Maryland office" and the other described generically as a "managing attorney," but without association with any of the three jurisdictions in which she is admitted to practice. Given the obvious marketing purpose of the web site and its non-exhaustive content, it is unreasonable to infer from this context that K & S only maintains two managing attorneys, one for its sole Maryland office and one who manages the remaining eight jurisdictions. The dissent, from a wholly unreliable and non-comprehensive source, overreaches in its zeal to justify disbelieving Respondents' representations in the record of these cases.

does not seem well-served by a greater minimum "sit-out" period.

The casual reader may question the sense of a requirement that attorneys, not admitted to practice law in Maryland and evincing no desire to become so admitted, are obliged to petition the Court of Appeals of Maryland for "reinstatement." This misperception evaporates on a more fulsome consideration of the relevant rule. Maryland Rule 16–701(j) defines "reinstatement" as the termination of a suspension or exclusion from any privilege associated with the practice of law in the State. Under Maryland Rule 16–760(k), when an out-of-state attorney is suspended by the Court of Appeals for misconduct sanctionable under the MRPC, the Clerk of this Court places the name of the attorney "on a list maintained in that Court of non-admitted attorneys who are excluded from exercising in any manner the privilege of practicing law in the State." Thus, reinstatement does not implicate, in this case, actual admission to the Maryland Bar; rather, it is required to remove Respondents' names from the list of attorneys that enjoy no privileges associated with the practice of law within the State, including supervising other lawyers. *See* Md. Rule 16–781(k)(3) (describing duties of the clerk in regards to attorneys not admitted to practice on reinstatement). This too likely will have a bearing on reciprocal discipline elsewhere, if any. Thus, Respondents shall be indefinitely suspended, with the right to apply for reinstatement no sooner than 90 days after the effective date of the suspension. The effective date of the suspension shall be 30 days after the filing of the Court's mandate in this case.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–515(C), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION JOINTLY AND SEVERALLY AGAINST CRAIG KIMMEL AND ROBERT SILVERMAN.**

BATTAGLIA and ELDRIDGE, JJ., Dissent.

Dissenting Opinion by BATTAGLIA, Judge, which ELDRIDGE, J., joins.

I respectfully dissent.

I agree with the conclusions that Silverman and Kimmel, Respondents herein, violated MRPC 5.1 ("Responsibilities of Partners, Managers, and Supervisory Lawyers") as well as 1.4 ("Communication") and that indefinite suspension is the proper sanction. What I disagree with is permitting the Respondents to apply for reinstatement in only 90 days, because of what the majority characterizes as "mitigating factors." Respondents' conduct demonstrably was more egregious than that of other lawyers upon whom we have imposed greater sanctions, and, moreover, the aggravating factors in the present case mandate a more substantial sanction.

This Court has addressed very few 5.1 violations and in each of the cases in which a lawyer was sanctioned for supervisory dereliction, the breadth of the systemic failure constituting the Rule violation was exponentially less than in the present case. In *Attorney Grievance v. Hines*, 366 Md. 277, 295, 783 A.2d 656, 666 (2001), we concluded that "indefinite suspension from the practice of law, with the right to apply for readmission six months from the date of his suspension" was the appropriate sanction for a violation of the Rule governing conflicts of interest as well as Rule 5.1, when an associate at Hines' office represented Hines' wife in a suit to recover money the wife loaned to a corporation of which Hines was a partial owner; one matter was implicated. A flawed system of litigation management in *Attorney Grievance Comm'n v. Ficker*, 349 Md. 13, 32, 44–45, 706 A.2d 1045, 1054, 1060 (1998), along with a prior reprimand, yielded an "indefinite suspension from the practice of law, with the right to reapply for admission after 120 days" subject to specific monetary and supervisory requirements;[1] the most serious of Ficker's violations arose out

---

1. As a condition to Ficker's reapplication, Ficker was ordered by this Court to "pay all costs assessed by this Court" and obtain "a monitor, acceptable to Bar Counsel, who will agree, at Ficker's expense, to oversee Ficker's practice of law for a period of at least two years and to

of his practice of "assigning too many cases to too few lawyers, mostly at the last minute." Significantly, when Ficker was again sanctioned for careless management in *Attorney Grievance v. Ficker,* 399 Md. 445, 447, 455–56, 924 A.2d 1105, 1106, 1111 (2007), the sanction imposed was "indefinite suspension from the practice of law, with the right to reapply for admission no earlier than one year form the effective date of the suspension."

In the case in which we meted out the same sanction as the majority does here, *Attorney Grievance v. Mooney,* 359 Md. 56, 95, 753 A.2d 17, 37–38 (2000), we considered an instance where an associate was not assigned a case until the day before trial and, thus, appeared at trial unprepared, reflective of a systemic failure to provide case files in a timely manner and to ensure that the associate was aware of her responsibilities. Mooney's supervisory failure, however, was not on the same level as the systemic neglect of supervisory duties in the present case, in which *forty-seven cases* were dismissed with prejudice and a massive meltdown in an active litigation practice ensued. The results of Kimmel and Silverman's lapses in judgment were much harsher than in any case reviewed.

The hearing judge in the present case clearly flagged the distinction between the harm attributed to Kimmel and Silverman's conduct and that sanctioned in other cases, when she wrote: "the harm caused by the lapses of practice within the firm is perhaps more egregious than any of the other cases cited. Forty-seven cases were dismissed based upon the failures of an associate under the supervision of Kimmel and Silverman." The most noteworthy of these lapses is that Kimmel and Silverman never set foot in the Maryland office to determine whether the practice met ethical standards until Katz quit, even though their name was rooted on the door. They also demonstrated considerable lack of judgment and

---

provide to Bar Counsel monthly reports for one year and quarterly reports for the second year." *Attorney Grievance Comm'n v. Ficker,* 349 Md. 13, 44–45, 706 A.2d 1045, 1060 (1998).

care when they hired a lawyer with absolutely no experience in contested litigation or "lemon law," did not provide even a day's worth of apprenticeship in the Maryland office, failed to more closely monitor Katz and failed to tailor the practice to Maryland where, as the hearing court wrote, "[t]he inability to file all cases in one jurisdiction, the aggressive approach to some of the discovery litigation, venue and expert challenges, and the lack of early arbitration all differed" from the standard practice in other states where the firm practiced, leading to an increased workload for Katz.

It is also significant that Kimmel and Silverman dismissed Katz's "consistent pattern of requests for on site assistance." In fact, the hearing judge's findings demonstrate that the firm culture was one where requests for supervisory instruction and other assistance were either responded to harshly or demeaned. In response to a plea for assistance in late November of 2004, one of the members of the firm emailed Katz, with copies sent to both Kimmel and Silverman, stating "no excuses, don't call, no need to talk, just get on it and only call me with good positive news of settlements, or demands your [sic] going to make." The hearing judge also found that in December of 2004 another exchange occurred between Katz and the Office Manager after another Katz inquiry, with the following result: "Katz inquired of the Office Manager whether there was any news about hiring a paralegal for Maryland. In response, she was reminded of the need to file fifteen complaints per week."

The majority, however, relies only on perceived mitigating factors to support the decision to permit Respondents to reapply for admission after only 90 days. Without any factual findings in support, the majority posits that, "Respondents understand where they erred and are unlikely to repeat history," although a review of Kimmel and Silverman's website, http://www.lemonlaw.com (last visited July 29, 2008), reflects that they have only two "managing attorneys" for offices in eight states as well as the District of Columbia. Two attorneys supervising what is occurring in a high-volume practice over nine jurisdictions, including Maryland, does not

reflect understanding of the need for supervision and increased care.

Additionally, the majority's discussion of the Respondents' recovery efforts as "intense, immediate, and largely effective" is a mischaracterization of the hearing court's findings. Far from efforts that were "intense, immediate, and largely effective," in the one effort documented, Kimmel and Silverman failed for *six months* after Katz resigned to respond to Charles Carter, a client of the firm whose lawsuit was dismissed for lack of prosecution:

> Carter also sent letters to K & S's home office on August 23, September 10, September 28[,] December 31, 2005 and February 6, 2006 seeking a status update and Scheduling Order. Carter also sent e-mails to the home office. The first responsive communication Carter received was a letter dated February 7, 2006, advising him of the dismissal of his case.

Although Carter was eventually compensated, it is clear, as the hearing judge found, that "Silverman did not become involved until Carter hired counsel after learning of the dismissal." The fate of the forty-six other clients whose cases were dismissed with prejudice due to Kimmel and Silverman's inadequate supervision and who, unlike Carter, presumably did not obtain outside counsel after their dismissals, has not been adequately addressed.

The aggravating factors clearly outweigh any perceived, albeit not real, mitigating factors. Forty-seven dismissals resulted from Respondent's lack of supervision. Kimmel and Silverman also have had substantial experience in the practice of law, because both were admitted to the Pennsylvania bar in 1989 so that they clearly understand the complexities of a litigation practice, but did not supervise a novice. Finally, Respondents established their foothold in "lemon law" cases nearly seventeen years ago, certainly sufficient time to develop the level of supervision adequate enough "to ensure that the firm has in effect measures giving reasonable assurance

that all lawyers in the firm conform to the Maryland Lawyers' Rules of Professional Conduct." Rule 5.1(a).

Katz was disbarred by consent for her actions. Justice and our concern for the public welfare dictate that the lawyers who *ensured her downfall* should receive at least an indefinite suspension for a period much longer than 90 days.

Accordingly, I dissent.

Judge ELDRIDGE authorizes me to state that he joins in this dissenting opinion.